Filed 5/22/25; Certified for Publication 6/17/25 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re MARK A. ROGOWSKI<br><br>on<br><br>Habeas Corpus. | D084748<br><br>(San Diego County<br>Super. Ct. No. HCN1486/<br>CRN20471) |

ORIGINAL PROCEEDING on petition for writ of habeas corpus. Petition denied.

Charles Carbone for Petitioner.

Rob Bonta, Attorney General, Sara J. Romano, Assistant Attorney General, Amanda J. Murray and Linnea D. Piazza, Deputy Attorneys General, for Respondent.

INTRODUCTION

Mark A. Rogowski stands convicted of the 1991 brutal rape and murder of Jessica Bergsten.  After her skeletal remains were found in a shallow grave in the desert east of San Diego, Rogowski confessed to police he had bludgeoned Bergsten's head with a metal steering wheel lock called "the Club" and, while she bled, shackled her hands and feet, cut off her clothes with a pair of scissors and raped her for three hours.  He then placed her in a

surfboard bag, suffocated her with his hands until she died, and drove her lifeless body to the desert where he buried her. Shortly before these crimes, Rogowski had threatened to kill his former fiancée, Bergsten's friend, and bury her in the desert.

In exchange for the prosecutor's dismissal of the special circumstance of murder in the commission of rape, which made him eligible for a life without parole or death sentence, Rogowski pled guilty to forcible rape and first-degree premeditated murder. Pursuant to the plea bargain, he was sentenced in 1992 to a total term of six years for the rape plus 25 years to life for the murder. This court affirmed the judgment on direct appeal. (*People v. Anthony* (Jan. 14, 1993, D016423) [nonpub. opn.].)

Rogowski was repeatedly found by state forensic psychologists to meet the criteria for a sexual sadism disorder and personality disorder with narcissistic features. After finding him unsuitable for release to the public in 2011 and 2016, the Board of Parole Hearings (Board) granted Rogowski parole in 2019. Governor Gavin Newsom, acting on his constitutional and statutory authority to independently review the Board's parole grant, reversed the Board's decision. We upheld the Governor's reversal in 2020. (*In re Rogowski* (Aug. 19, 2020, D077779).)

In 2022, when he was 55 years old and had served 31 years in prison, the Board granted Rogowski parole a second time. The Governor found Rogowski still posed an unreasonable danger to society if released from prison and, again, reversed the Board's decision to grant parole. After the superior court declined to reverse the Governor's decision, Rogowski filed a petition for writ of habeas corpus in this court. We issued an order to show cause and, having independently reviewed the extensive record, we now uphold the Governor's decision and deny Rogowski the relief he requests.

2

STANDARD OF REVIEW

"Whether to grant parole to an inmate serving an indeterminate sentence is a decision vested in the executive branch, under our state Constitution and statutes. The scope of judicial review is limited." (*In re Shaputis* (2011) 53 Cal.4th 192, 198–199 (*Shaputis II*).) "The awesome responsibility of deciding whether to release a convicted murderer on parole—an act that inherently runs the risk of recidivism, i.e., the risk that the inmate will again kill an innocent person—lies with the executive branch, not the judicial branch." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1230 (dis. opn. of Chin, J.) (*Lawrence*).)

Under the legal framework that governs parole decisions, "the Board is given initial responsibility to determine whether a life prisoner may safely be paroled." (*Shaputis II*, *supra*, 53 Cal.4th at p. 215.) The Governor is authorized by article V, section 8, subdivision (b) of the California Constitution to then conduct "an independent, de novo review of the inmate's suitability for parole." (*Lawrence*, *supra*, 44 Cal.4th at p. 1204; *id.* at p. 1203, fn. 9.) And although the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision, "the Governor has discretion to be 'more stringent or cautious' in determining whether a[n] [inmate] poses an unreasonable risk to public safety." (*Id.* at p. 1204.)

The Governor's parole suitability decision is subject to judicial review. (*Shaputis II*, *supra*, 53 Cal.4th at p. 215.) Our review, however, is "highly deferential." (*Lawrence*, *supra*, 44 Cal.4th at p. 1204.) To ensure courts of appeal apply the "proper scope of review," the California Supreme Court summarized the principles governing review of parole decisions as follows: "1. The essential question in deciding whether to grant parole is whether the inmate currently poses a threat to public safety. [¶] 2. That question is

3

posed first to the Board and then to the Governor, who draw their answers from the entire record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior.[1] [¶] . . . [¶] 4. Judicial review is conducted under the highly deferential 'some evidence' standard. The executive decision of the Board or the Governor is upheld unless it is arbitrary or procedurally flawed. The court reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision. [¶] 5. *The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch.* Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence." (*Shaputis II*, at pp. 220–221, italics added.)

The " 'some evidence' " standard of review that courts apply as part of this framework "is meant to serve the [inmate's] interests of due process by guarding against arbitrary or capricious parole decisions, without overriding or controlling the exercise of executive discretion." (*Shaputis II*, *supra*, 53 Cal.4th at p. 199.) Review under this standard is "limited, and narrower in scope than appellate review of a lower court's judgment" under the substantial evidence standard (*id.* at p. 215), and it "may be satisfied by a lesser evidentiary showing" (*id.* at p. 210). "Any relevant evidence that

---

1    Step 3, not relevant here, is "The inmate has a right to decline to participate in psychological evaluation and in the hearing itself. That decision may not be held against the inmate. Equally, however, it may not limit the Board or the Governor in their evaluation of all the evidence." (*Shaputis II*, *supra*, 53 Cal.4th at p. 221.)

4

supports the parole authority's determination is sufficient to satisfy the 'some evidence' standard." (*Id.* at p. 214.)

In reviewing the Governor's reversal of a grant of parole, we consider the whole record in the light most favorable to the Governor's decision. (*Shaputis II*, *supra*, 53 Cal.4th at p. 214.) And because "we may look to the entire record for evidence supporting the reversal, and are not limited to the evidence specified in the Governor's written decision" (*In re Van Houten* (2023) 92 Cal.App.5th 1, 32 (*Van Houten*)), we provide a thorough summary of the extensive record compiled in this case.

Our summary is detailed for another important reason. Almost everything we know about Rogowski is self-reported, from the details of his personal history to the facts of his assault of Bergsten to the psychological symptoms he experienced before and after the murder. Yet over the years of his incarceration, he has made inconsistent statements on each of these topics, leading numerous officials, including the probation officer, forensic psychologists, and the Board, to doubt his veracity. These inconsistencies, in turn, bear on our conclusion that the record supports the Governor's parole unsuitability decision, including the Governor's determination that Rogowski possessed a materially deficient level of insight. (See, e.g., *Shaputis II*, *supra*, 53 Cal.4th at p. 215 [when "the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary"]; *In re Mims* (2012) 203 Cal.App.4th 478, 488 (*Mims*) [inmate's varied reports of rapes and physical abuse were properly interpreted as "an evolving effort to mitigate [the inmate's] own culpability" and constituted some evidence of the inmate's lack of insight into the cause of the crime].)

BACKGROUND

I.

*Brandi McClain*

Rogowski's rape and murder of Bergsten were reportedly motivated at least in part by the "murderous rage" he felt against Brandi McClain. McClain dated Rogowski for about four years and had been engaged to marry him. She told police she broke up with Rogowski around December 1990 or January 1991. The last time she saw him, Rogowski threatened her, "I should take you out to the desert and beat the living shit out of you and kill you and bury you and nobody would even know about it and you know what? If they did, you would deserve it, and the court would believe me." (Underline omitted.) About a week later, her home was burglarized. Personal items she believed only Rogowski would want were stolen, including her clothes, photographs and papers.

Rogowski admitted in an interview with a state forensic psychologist that he burglarized McClain's home after they broke up and did it using a key she had given him. In parole proceedings, Rogowski testified he went to McClain's house with a "murderous intent" and "had fantasized about hurting her." But when he went there and found she was not home, he entered the house and took back his belongings and "some other things." When he was asked, "How did you intend to kill her?", Rogowski said, "I guess with my hands." Rogowski stated he went to McClain's house with these "homicidal thoughts" about McClain in the "weeks . . . maybe days" before he killed Bergsten.

## II.

### *Bergsten's Rape and Murder*[2]

Bergsten was last seen by a neighbor a few days after March 17, 1991, standing on the porch of her Pacific Beach apartment with Rogowski. On April 10, her skeletal remains were found by vacationers in the desert near Ocotillo in Imperial County. What was left of her body was near a ravine, uncovered by dirt or sand. No clothing, shoes or jewelry was on or near her. Her hands, feet, and one calf were mummified. Several of her upper front teeth were missing, though photographs of her alive showed no missing front teeth.

---

[2]     Our summary of the commitment offenses is mainly taken from police reports, the probation report, and this court's unpublished opinion in *People v. Anthony*, *supra*, D016423. When we authored that opinion, Rogowski went by the name Mark Anthony. Also, in our prior opinion we used he/him pronouns when referring to Anthony, now Rogowski. In a 2022 community risk assessment, however, Rogowski opted to use nonbinary (they/them) pronouns. But in the present habeas petition, Rogowski has returned to using he/him pronouns, and so we also refer to Rogowski using he/him pronouns.

The People moved to have the probation report filed under seal. We deny the motion. The People's sole basis for having the report sealed is that it is confidential under Penal Code section 1203.05 and purportedly must be sealed under California Rules of Court, rule 8.47(c). (See Pen. Code, § 1203.05 [limiting public access to probation reports].) Although rule 8.47(c) authorizes the filing under seal of confidential records, the Advisory Committee comment to rule 8.47 explains that the provisions of Penal Code section 1203.05 create alternate requirements that supersede the requirements of the rule. (See *People v. Connor* (2004) 115 Cal.App.4th 669, 676 [describing process for gaining access to probation reports].) We order the probation report unsealed and direct that it be designated as a confidential record.

On May 7, 1991, Rogowski confessed he had raped and killed Bergsten nearly two months earlier, in late March.  In taped interviews, he provided the police with the following statement.

Bergsten was McClain's best friend.  Rogowski had recently become a Christian and had wanted McClain to convert to his new beliefs.  McClain did not want to change her lifestyle.  Believing McClain continued to do drugs and "be sexually promiscuous," Rogowski broke up with her.  Rogowski then heard McClain had been sexually involved with another man.  Though they had already separated, he became "so upset" with her that in the early part of March 1991 "he went to McClain's house to kill her."  But she was not home and he "never fulfilled that thought."

Rogowski "felt McClain and Bergsten were cut from the same mold and that Bergsten's influence had made McClain a slut."[3]  He had not seen Bergsten for several years when she called him a few days before March 20, 1991.  She had just arrived in town and, not knowing anyone else, asked Rogowski to show her around.  Rogowski believed Bergsten was "totally enamored" with him.  But he "didn't even like her."  He explained, "She represented[ ] everything that I hated.  A sleazy lifestyle and sleeping with different guys all the time."[4]  However, he said he had "a certain compassion for her loneliness or something."  He made a date to see Bergsten for March 20.

---

[3]    For ease of reading, we have removed internal quotation marks where appropriate throughout this opinion.

[4]    McClain, who had been best friends with Bergsten since they were 15 years old, confirmed that Rogowski "couldn't stand" Bergsten.  "He spoke negatively about her and did not want her to be friends with [Bergsten]."  And because McClain broke up with him, Rogowski "hated" Bergsten.

That day, Rogowski drove to Pacific Beach and picked up Bergsten at her apartment. After they ate in La Jolla, Bergsten asked to see his condo in Carlsbad so they drove there. A while later, they went to a video store to pick up movies and stopped at a liquor store to buy wine. They went back to his place, watched the movies, and drank the wine. He said he drank about four glasses and she smoked a marijuana cigarette, but "[o]ther than that there was no drug usage."

They did not have sex at this time, but Rogowski remembered "one kiss." He was not sexually attracted to Bergsten and "did not have any desire in that regard." In his view though, "Bergsten was being seductive during the whole evening."

Sometime during "the late evening and early morning," Rogowski went down to his car in the garage, alone. He told police he needed to check the car for his driver's license so he could drive Bergsten home. He saw the Club under the front seat. "He felt how much he hated Bergsten because of her life[style] and what she had done to McClain." He took the Club upstairs to his living room, where Bergsten was gathering her things, and struck her with it on the back and side of her head. He "just started wailing on her" and believed he "probably gave her three good hits" to her head.

Bergsten "was bleeding pretty bad from her head." She said something like, "You didn't have to do that." He handcuffed her with a set of metal handcuffs that had been hanging on his coatrack. He carried her upstairs to his bedroom, where he now shackled her hands behind her back with leather handcuffs and her feet with leather straps. He told police he had bought the leather straps and shackles a couple of months earlier, "for no reason in particular."

9

Although bleeding "bad[ly]," Bergsten was still conscious and kept saying, "I'm sorry.  You don't have to do this.  I'll go to bed with you."  She told him that "he didn't have to hurt her.  She would do anything he asked."

Rogowski cut off Bergsten's clothes with a pair of scissors.  He "wanted to humiliate her."  But then, Bergsten "started saying things she wanted to do to him," which confused him because he thought she was scared.  He acknowledged she had "fear in her eyes," but said "it seemed like she started to like it" and that for about three hours, "[they] just . . . had sex."  "She was shackled at the ankle so she was able to spread her knees for him to make penetration."

Rogowski said "[t]hey stayed up all night" and "she never really said she wanted to be let go."  "When the sunlight came up, she started to ask for water and to loosen her wrists and feet."  He stated he "wouldn't" comply with her requests because he "didn't want to," claiming he didn't know what he was doing.

After he raped Bergsten, he left her in the bedroom "so she would not be seen by anyone" and returned to the living room.  But "[s]he was calling out to him loud enough that he felt the neighbor would hear."  He went upstairs, put her into a surfboard bag and "zipped it closed."  "She began screaming because she found it hard to breath[e].  While she was still in the bag[,] he wrapped his arms around her and put his hand over her mouth until she died."  He told the police, "I compressed my hand over her mouth through the surfboard bag so she couldn't breath[e] anymore."  (Underline omitted.)

He took her lifeless body out of the bag, carried her to his car and placed her in the trunk.  He put her clothes, the clothes he was wearing, the surfboard bag, the Club, the scissors and the shackles in the car, along with a

shovel. He then drove Bergsten's body to an area in the desert off the Interstate 8 highway and buried her in a shallow grave.

He continued east on the highway and eventually drove to Phoenix, Arizona. Along the way, he stopped and discarded the instruments of his crimes over embankments or overpasses. He used only cash to buy gas or food as he traveled. When he returned home, he rented a "Rug Doctor" and "cleaned the condo extremely well to remove all traces of the crime[s]." (Receipts obtained by the police showed he also had his car washed on March 22.)

A few days after Rogowski killed Bergsten, a police detective investigating her disappearance visited him and asked him if he knew her whereabouts. He "acted very cool" and "tried not to show any emotions," as he "lied to the detective and told him that [he] had never seen [Bergsten]."

Rogowski never told anyone about his crimes until May 6, 1991, when he told his pastor, Augustine Constantino. According to Constantino, Rogowski was distraught after a bible study. Rogowski then told him that "he got the girl (Bergsten) to his house, they drank wine, got drunk and smoked cloves. He bound her, abused her and did everything he could to her. . . . She wouldn't be qui[et], and he was afraid people would find out, so he put her into the bag. Then strangled her. Before putting her in the bag and binding her he had hit her with the [C]lub." Rogowski confided in Constantino he was having "wicked dreams" about hurting McClain.

Constantino accompanied Rogowski to the police station on May 7, 1991. Although Bergsten's decomposed body had already been discovered about a month earlier, the police had Rogowski take them to the location where he had buried her. He declined to give the police consent to search his

11

condominium and car.  After a search warrant was obtained, blood stains matching Bergsten's blood type were found in his condo.

III.

*Rogowski's 20-Page Handwritten Retraction of His Police Confession*

In 1992, Rogowski pled guilty to the forcible rape and first-degree murder of Bergsten, in exchange for the prosecutor's dismissal of the rape-murder special circumstance.  As part of his plea, he specifically agreed the murder was willful, deliberate and premeditated.  However, before his presentencing interview with the probation officer, Rogowski submitted a 20-page handwritten statement which the officer described as a "detailed retraction of everything to which he originally confessed."

In this second version of events, Rogowski agreed to see Bergsten because he felt "pity" for her.  When he picked her up at her place, she had already been drinking.  She continued to drink and became "tipsy" at the restaurant where they ate.  They left and went back to her apartment, where Bergsten made mixed drinks and changed into a t-shirt and shorts.  When he announced he was leaving, she became "amorous, pleading that [he] take her somewhere."  She began to "mock-cry" and "seemed suicidal," so he was "talked into" driving her to his Carlsbad condo to show her around and rent some movies.

While driving to Carlsbad, Rogowski became "embarrassed . . . like a sixth grader" because she asked him many personal questions.  She was "very friendly, using almost every turn in the conversation to discuss sexual things—offering insights to her preferences (positions, accessories, frequency etc.) and in great detail."  She told him she had a "secret goal to lay [him] or get [him]."  "Memories of her pinching [him] and looking sultry at [him] came to mind as she confessed, 'Every[ ]time I saw you away from her [(McClain)],

12

I felt like jumping your bones.' " Bergsten "continued to talk of S&M sex and how she just got into being tied up and spanked and stuff."[5] Although he was getting aroused, "there was inside [him] a war to resist her temptation" and he "vowed" to himself he would stay "unaffected" and drive her home later that night.

They arrived at his place after they picked up the movies and two bottles of wine. He took three pills she offered him from a prescription bottle. "[T]he promiscuous gestures and inquiries she'd made in the car ensued" and "now and then" she commented on the handcuffs hanging on the coatrack by his door, which he "purchased as one of the many novelty items within [his] home," asking him, "what are those for? . . . looks like fun . . . Why don't you try 'em on me?!"

They went out again for another "wine run" and she picked up three more bottles of wine. Back at his place, he felt "unusually relaxed" and finally accepted a glass of wine. He wrote that she again started with "the seductive remarks, this time removing different articles of [her] clothes . . . and her come on was getting increasingly aggressive. . . . And the more I tried to reject her advances, the more sultry and insistent she became. . . . Intermittently, she'd make lewd physical gestures, . . . often trying to touch and grab me sexually, to kiss me." She told him, "You know you just wanna hurt me . . . tie me up and f _ _ _ me."

Rogowski stated this went on throughout the night as Bergsten kept filling his glass with wine. He estimated he drank "about 6 large glasses full that evening" and he was "very impa[i]red" He wrote, "my resistance to her

---

5     Rogowski did not capitalize the first-person pronoun "I" throughout his written retraction; we add the capitalization without further indication.

advances was worn" and "I found myself accepting and returning a long, open kiss on the lips with some slight fondling.  She offered, 'Those cuffs still look really good.'  Suddenly, it dawned on me what was happening:  the heavy-petting, the booze, the pills, my falling for it all.  I jumped up from the carpet, saying 'That's enough . . . please, just get dressed and let's go.' "

He went downstairs to the garage "to warm-up the car" because it needed "5 or so minutes of idling."  While it idled, he started to clear "all the excess articles from the backseat and floors," which included the Club.  When he brought everything upstairs to his place, he found Bergsten "standing in the middle of the room."  Her "shirt was off and pants undone as she fondled herself unabashedly before the fireplace."  His "first thoughts were of disbelief, then arousal, and then submission to her."

He continued:  "I took a few steps forward during her display.  That was the moment I was compelled to hit the side of her head with the [Club], with light to medium thrust.  She stood silent momentarily, holding her head, before I dropped the lock and she said, 'The handcuffs!'  I then took 2 steps toward the coatrack to grab the two sets there.  The first set I applied to her ankles as she stood; then, helping her to sit, I applied the remaining set to her wrists.  She was lucid and conscious, and surprisingly aroused as she suggested we go upstairs to my room.  We hobbled upstairs as I held her side and arm for balance.  Entering my room, it was evident that her head was bleeding, so she sat down on the floor[.]  I went for a wet cloth for her head.  But instead I helped her to the shower to wash out her hair . . . .
[¶] Strangely, she kept saying things like, 'Thank you, Mark . . .  I'm so sorry, . . . I've been a bad girl . . . I know I've been bad, and you have to punish me, K?  I promise I'll never do it again . . . thank you, Mark, thank you.' "

14

He continued: "After drying her hair and opening the windows and balcony door, we laid down on the floor in the middle of the room. I kept feeling weird and wrong, aroused then not. Pleading and begging, she asked to be spanked and for sex in a pretty loud manner. But I was so slow and confused, . . . My hesitation led to her demanding, again making accusations like, 'You probably couldn't get it up anyway,' and, 'come on, you wimp . . . what's the matter? That Christian stuff made you w[ei]rd. So I went to remove her pants, but she requested I cut them off. After some consideration, I obliged to cutting the pants off w[ith] scissors and then attempted to have intercourse—half-erect—but after 10 or 15 minutes stopped, not really sure or caring if I'd had an orgasm (though I think that she had some)."

Rogowski wrote that it was now 4 or 5 a.m. and he retrieved "some sleeping bags" for them. He slipped into his sleeping bag and "helped her into hers." He then "hear[d] footsteps and voices coming up the front walkway just under [his] balcony." He became afraid "of being discovered with a woman in [his] room, by whoever was approaching." Bergsten would not be quiet and "carried on in her intoxicated way." So he "placed [his] hand over her mouth and craned [his] neck to peer out the door and see . . . , for about 30 seconds, but they walked past." He took his hand from her mouth and looked at her. She was "blankly staring back at [him]" and no longer breathing or had a pulse. He concluded this narrative with an apology: He was "sorry [Bergsten] is gone" but he "do[es] not feel what happened was rape or murder one, as defined."

When the probation officer told Rogowski the retraction bore "no resemblance to his original confessions," Rogowski blamed Constantino. He said Constantino "was very influential" and had "instructed him by saying the worse his story was the better the testimonial would be." He also blamed the

detectives for putting words in his mouth. He told the probation officer he wanted to take responsibility for being "negligent" in putting his hand over Bergsten's mouth and disposing her body, but he denied "ever hating" her. Instead, he claimed it was McClain who spoke badly about Bergsten.

Unpersuaded, the probation officer considered Rogowski's 20-page retraction to be an aggravating factor and a "clear sign as to [his] deranged character, and his danger to others."[6]

IV.

*Rogowski's Post-Convictions Statements About the Commitment Offenses*

Over the years, Rogowski has been interviewed by four forensic psychologists in comprehensive risk assessments (CRAs) prepared for the Board, in 2009, 2015, 2019, and 2022. He has testified at five parole hearings, in 2011, 2016, 2019, 2021, and 2022. He also submitted "numerous self-typed documents detailing various aspects of his history" to at least one of the state forensic psychologists and/or the Board. (Italics omitted.) Three of the four psychologists explicitly found Rogowski not to be a "reliable or credible historian." As one psychologist noted, "there have been inconsistencies in . . . Rogowski's reporting of his psychosocial history, as well as his description of the life crime" as first recounted in his police confession.

---

[6] Rogowski would later admit at his first parole hearing that "[a]lmost everything [he] said" in the 20 pages he wrote "was a lie." Yet, as we later discuss, strains of the admittedly false retraction continued to reappear in later versions Rogowski would provide of the crimes.

Rogowski has also claimed, at various times, that he wrote a letter to the probation officer "the very next day after the [presentencing] interview" to explain the 20-page retraction was false and to take "full responsibility" for his crimes. There is no mention of such a letter in the probation officer's report.

(Italics omitted.)  Here, we summarize three stark examples of material inconsistencies in his statements about the commitment offenses.

A.  *Intent to Physically or Sexually Assault Bergsten*

In his 1991 police confession, Rogowski said he went to his car to check for his driver's license when he saw the Club.  He then felt his hatred for Bergsten and took the Club back to his living room and "just started wailing on her."

In the 2009 CRA, Rogowski changed his explanation for why he retrieved the Club.  He said he went to "warm up [his] car" and, while it was idling, he collected his "clothing and files" and "*for some reason grabbed*" the Club.  (Italics added.)  He then went upstairs, put everything on the floor, and "[a]*t that time*, had the "thought to hit her with the lock."  (Italics added.)  He maintained this statement at his 2011 parole hearing, asserting he formed the thought to hit Bergsten with the Club only *after* he had returned to his living room.  The presiding commissioner responded "[t]hat doesn't make any sense" and asked, "Why would you take [the Club] in the house unless you're going to use it for something[?]"  Rogowski responded, "I used the wheel lock for my bicycle" and "[s]ometimes I brought it up."

In the 2015 CRA, Rogowski said he was "very inebriated" when he returned upstairs with the Club and "all this stuff."  After he dropped the Club, along with everything else, onto the floor, he had an "epiphany" that Bergsten was "responsible for all of [his] problems."  And then, "[w]*ithout thinking*," he told the psychologist, "I picked up the steering wheel lock and walked over to [Bergsten] and struck her on the head three times."  (Italics added.)

At his 2016 parole hearing, Rogowski changed this explanation again.  This time, he said he formed the intent to hit Bergsten with the Club in the

17

garage *when he took the Club from the car*: "I think that is when I formed the intent. That's when I decided that I was going to hit [Bergsten] with the steering wheel lock. [¶] . . . [¶] [T]he idea formed in my head when I was in the garage." Asked, "Is that why you took the steering wheel lock out of the car?," he responded, "I'd say yes."

At the 2021 parole hearing, the presiding commissioner "questioned" Rogowski's "rationale for meeting [Bergsten] that night based on [his] feelings towards her." The commissioner was skeptical that Rogowski had not formed the intention to harm Bergsten earlier, either before or during their date, given his intense feelings of hatred toward Bergsten. The commissioner asked, "[A]t this point, there's no indication that you're mad. . . . You bring stuff out of your garage then all of a sudden you changed to where you just out of the blue hit her with the [C]lub in the back of the head. How does that . . . go from there to there that quick? No thoughts of homicide, no thoughts of harm to all of a sudden beating her with a [C]lub." Rogowski acknowledged, "I know that . . . it would seem suspect that I had no intention to hurt her . . . that day when I was driving towards her house or when we were going out to eat." After attempting to explain his thought processes, he entertained the *possibility* he had "some kind of intent . . . to transfer that rage [he] had against [McClain] . . . over to [Bergsten]," though not consciously, "from the beginning of the day that night, possibly."

Then at the 2022 parole hearing, he admitted he did intend to physically or sexually harm Bergsten *when he called her back and made plans to meet her*. The prosecutor asked, "When the inmate called [Bergsten] back and made plans to meet with her, did he ha[ve] the intention to physically or sexually harm her?" Rogowski responded, "I would not . . . have admitted to that back then, but I, I believe I did. I believe that there was a

18

shadow of an intent there of entertaining the idea of harming her in some way *sexually or otherwise*."  (Italics added.)

B.    *Duration of the Rape*

Rogowski told the police he had "sex" with Bergsten "for about 3 hours." At his 2011 parole hearing, he confirmed the rape lasted three hours.  The presiding commissioner asked him, "For three hours you raped her or did whatever you wanted?"  Rogowski responded, "I was inebriated at the time.  I don't know how much time went by.  I was able to penetrate, to have an erection . . . [o]nce" in the three hours.  The commissioner asked again, "Today, looking back, do you think the rape lasted three hours?"  He responded, "Yes."  In the 2022 CRA, he confirmed the rape lasted two or three hours.

But at his most recent parole hearing in 2022, he gave this testimony: "I raped her. . . .  I don't know whether it was three minutes or 10 minutes, but it definitely wasn't three hours."  He reiterated, "it definitely wasn't three hours of sexual activity."

C.    *Intent to Kill Bergsten*

In his police confession, Rogowski said he left Bergsten in his bedroom after the rape so she would not be discovered by anyone.  But fearing a neighbor would hear her calling out to him, he went upstairs and put her into a surfboard bag.  When she began screaming because she found it hard to breathe, he "got on top of her."  He said, "I compressed my hand over her mouth through the surfboard bag so she couldn't breath[e] anymore." (Underline omitted.)  Despite this confession and his guilty plea to willful, deliberate, and premeditated murder, over time, Rogowski made statements to minimize his culpability for her death.

In the 2009 CRA, Rogowski portrayed Bergsten's death as unintentional.  He said, after he raped her, "she was asking to leave, and I put my hand over her mouth when I heard the neighbor outside my window. I remember not wanting the neighbor to hear her voice.  So I grabbed the surfboard bag, and slide her inside it.  She continued to plead with me, and I covered her mouth again, *while listening to see if the neighbor had passed*, . . . [w]hen I looked down she wasn't breathing anymore.  [¶] I panicked and I tried to make her breathe, but I couldn't."  (Italics added.)

He maintained Bergsten's death was incidental to his trying to quiet her at his 2011 parole hearing, testifying that he "put [his] right hand cupped over her mouth area" as he "was listening for [his next door neighbor] to go out the gate, for the gate to slam" and, when he "heard the gate slam," he realized she wasn't moving and "that's when [he] murdered her."  He continued to make this claim four years later in the 2015 CRA.

At his 2016 parole hearing, Rogowski denied having "murder on [his] mind" when he struck her with the Club; instead, he claimed he formed the intent to kill her "upstairs in [his] effort to avoid responsibility."  When the deputy commissioner confronted Rogowski on the inconsistency between this account and his earlier statements that her death was incidental to his attempts to quiet her, he acknowledged the inconsistency.  The commissioner then asked, "So which one is accurate?"  He responded:  "I think as I go on in my recovery and I become more honest with myself about what happened that night and just kind of lose the barriers and the pretense of wanting to save my image, I just want to throw myself into what I did, you know, at face value and honesty.  And I want it to be – I don't want to avoid anything anymore."  The commissioner brought him back to the question, "So you – that's when you were intentionally trying to suffocate her[?]"  He finally

answered, "I think so. I think so. *I think there was the intent to kill that moment*." (Italics added.)

Despite the belated admission he intended to kill Bergsten, Rogowski returned to portraying her death as incidental to quieting her in the 2019 and 2022 CRAs and parole hearings. In 2022, in response to the question, "You've depicted killing her as sort of incidental to quieting her, but how else did you think it would end?" (italics omitted), Rogowski said: "I don't know, I don't know. [I] just didn't care, just didn't give a damn about the consequences. This was my depravity, not caring about a human life. Had I been sober, I would have that self-check mechanism; 'wait a minute, call 911, cut your losses.' Wish I could say I had a plan, a specific plan, but I didn't."

V.

*Rogowski's Pre-Conviction History*

Rogowski provided the following personal history to forensic psychologists during his CRAs and to the Board at his parole hearings.

A.  *Work and Family Background*

Rogowski was a professional and competitive skateboarder from about 14 years of age until his arrest. He earned "substantial amounts of money" and "garnered some renown" in the skateboarding industry, having competed in national and international competitions, designed and promoted skateboard products and accessories, and worked as a stuntman and model. He graduated from high school and completed some units at a community college.

Rogowski is the younger of two children, with a brother five years older. His parents separated before his birth, and he had little contact with his father. Shortly after Rogowski was born, his mother left for California with his older brother, leaving him with an aunt in New York and a sense of

abandonment.  At the age of three, he joined his mother and brother in California.

He reported that he grew up in "a nurturing environment," where he "felt loved, protected though [he] missed having a father sometimes."  His relationship with his mother while growing up was "very close."  He denied any history of physical abuse from his mother and described her as "over-indulgent and over[-]protective," and he "often felt as though his mother wanted him to fulfill the role of a partner, rather than her son."  He reported a few instances of physical abuse by his older brother.

Rogowski grew up hearing about his father's domestic violence.  He reported feeling a "sense of rejection" and "illegitima[cy]" from his father, who denied paternity.  When he first met his father, he found it was not a positive experience because his father was "unstable [and] angry."

He reported a history of alcohol abuse by his father and older brother and chronic depression among several family members, including his mother.  He began consuming alcohol at age 12 at family gatherings and then with friends at age 14 or 15.  He tried cocaine and crystal methamphetamine at age 16, using it sporadically when he completely stopped using drugs at age 19.  His major difficulty was with alcohol abuse.

B.    *Reported Sexual Abuse*

Rogowski has reported a history of being sexually abused as a child.  In the 2009 CRA, Rogowski described "multiple experiences of sexual abuse," with the first involving molestation by a female babysitter when he was three years old that occurred "a few times, maybe once"; a second involved a female cousin who was over 10 and began when he was four until he was 14; a third experience involved an aunt from the time he was four to 14; and a fourth incident occurred once with "an older male" when he was 15.

22

In the 2015 CRA, Rogowski reported he was "first fondled by a female babysitter" when he was three years old. A female cousin also "began initiating sexual acts" with him when he was three. He explained his cousin was about three years older and the two were made to sleep in the same bed when he stayed at her family's home. By the time he was in the fifth grade, he was living with his cousin and "they began having sexual intercourse every night" until he moved out of his cousin's home at age 12. He reported that once when he was seven, his aunt (the cousin's mother) "forced him to suckle her breasts." By the time he was 12, he was traveling with his skateboarding coach approximately four times a year until he was 16 and his coach "fondled him" on their trips. Rogowski reported "his most traumatic" abuse was perpetrated by a man in his 30s who picked him up when he was hitchhiking at age 15. Rogowski believed the man drugged him and had anal sex with him at the man's residence.[7] When he saw the man some months later while he "was out partying with friends at a nightclub," to explain his distress, Rogowski falsely told his friends "he had just been raped."

Dr. S. Hoyt, the forensic psychologist who conducted the 2015 CRA, observed that the information Rogowski provided "does not entirely coincide with the [p]robation [o]fficer's [r]eport . . . , which stated that the inmate had previously reported being molested by three individuals, including his female cousin, from 2 to 12 years of age; by a female babysitter when he was four or five years old; and by an older male playmate when he was five years old. [¶] Apparently no mention was made of an incident occurring when he was 15

7    In a 1992 psychological evaluation, Rogowski "discussed a situation where he, while under the influence of drugs, was a passing, agreeable partner for anal intercourse" and explained this was his only same sex contact.

years old with the stranger, who reportedly raped him." (Italics omitted.) Dr. Hoyt cautioned that "[b]ecause the inmate's account of sexual abuse differs rather significantly from previous versions, . . . Rogowski must be viewed as a questionably reliable historian in this domain." (Italics omitted.)

Dr. Hoyt also found it "noteworthy" that in a 1997 psychological evaluation by Dr. Adam,[8] "Rogowski's truthfulness was questioned with respect to his claim that he was sexually abused by multiple female family members at different times as a youth." (Italics omitted.) In the 2009 CRA, Rogowski was asked whether, as Dr. Adam wrote in his report, "Rogowski does have a history of making up dramatic but untrue stories about being raped or robbed for the attention and sympathy it brought him." Rogowski responded, "Yeah, I did that once or twice." When he was asked at his 2011 parole hearing if the statement was true, Rogowski responded, "Yes, my needs for being liked were pretty high. I always needed to be liked and approved of and I sought acceptance. . . . Sometimes I told lies."

In the 2019 CRA, the forensic psychologist stated Rogowski reported a "pretty extensive abuse history," but he "opted not to discuss" it during the evaluation, stating "it is 'retraumatizing to talk about it.' " Instead Rogowski provided the psychologist with a written chronological list of his sexual abuse history. This psychologist also noted "there has been some variation in his description of his sexual abuse history over the years."

Rogowski's account of his sexual abuse history as summarized in the 2022 CRA was also not consistent with his previous reports. There he stated he was physically and sexually abused by "an aunt and a cousin" shortly after

---

[8] We do not have a copy of Dr. Adam's 1997 evaluation, but it has been reviewed and discussed in CRAs by other forensic psychologists.

he joined his mother and brother in California and this abuse continued until he was 16 years old. He also reported one of his mother's boyfriends "fondled" him on one occasion when he was 12 or 13 years old, and that "individuals involved in coaching" him in "athletic endeavors sexually abused" him from age 16 to 18. There is no mention of the rape that occurred with the stranger when he was 15, or the molestation by the babysitter.

C.    *Prior Relationships*

Rogowski reported three romantic relationships of significance prior to his life crime. His first was a three- to four-year relationship with Brittany, a girl he met in high school, when he was 17 to 21 years old, followed by his relationship with McClain. Rogowski described his relationship with Brittany as "unequal," in which he was "dominant" and his "expectations would 'dictate' the relationship." At his 2016 parole hearing, Rogowski testified he had a prior relationship with someone named "Lynn," and Rogowski "started cutting" himself after Lynn broke up with him.

Rogowski acknowledged "there were dynamics" about his relationship with McClain that were "abusive emotionally and verbally and sexually coercive." He admitted he punched a hole in the wall in McClain's presence to assert his "authority or dominance over her." Although he stated he was not "physically abusive," he admitted he was "threatening," "verbally abusive" and "sexually abusive" toward McClain. He engaged in conduct that he characterized as "definitely border[ing] on stalking behavior," like "pa[ying] people to kind of monitor who [McClain] was dating, what she was doing." He "was insane with jealousy and resentment and just want[ed] to control and have power over her."

When asked at the 2016 parole hearing how he was "sexually abusive" of McClain, Rogowski stated, "Most of our conduct was mutual, but there

25

were times when I wanted to do things that she didn't want to do and we had had, you know, different adventurous type of sex, but you know, I was definitely, I think the leader as far as pushing the envelope and you know." "[I]t was abusive in the sense that I had more power in the relationships and she didn't feel the freedom to say no if she didn't want to or if she didn't want to do a certain thing." McClain told police that during the time they were together, she saw pornographic magazines and videos in Rogowski's residence. She described Rogowski as "sexually perverted and kinky." McClain told police "[s]he put up with [Rogowski's behavior] for years but just couldn't handle it anymore" when she broke up with him.

D. *Criminal Record*

Rogowski's adult criminal record included a prior conviction for driving under the influence and an arrest for false identification to a peace officer. He reported juvenile contacts with law enforcement, including being arrested as a teenager for driving while under the influence of intoxicants and running from police after trespassing.

## VI.

### *The First Three CRAs and Board Decisions*

Here we summarize the first three CRAs prepared for the Board and the Board decisions from Rogowski's first three parole hearings. In doing so, we defer comprehensive discussion of Rogowski's institutional behavior, rehabilitative programming and parole plans to our later discussion of the most recent, 2022 CRA and parole hearing.

A. *2009 CRA*

Dr. R. Atwood prepared the 2009 CRA for Rogowski's first parole hearing. At the time, Rogowski was 43 years old. Dr. Atwood found Rogowski met the diagnostic criteria for (1) alcohol dependence, without

26

physiological dependence, in a controlled environment, (2) sexual sadism disorder,9 (3) adult antisocial behavior, and (4) personality disorder not otherwise specified, with narcissistic and borderline traits.

In conducting this risk assessment, Dr. Atwood reviewed prior psychological evaluations in Rogowski's file. A 1992 initial psychiatric evaluation by Dr. Barsman listed diagnoses of "Compulsive Sadistic Sexuality," "Adult Antisocial Behavior" and "Mixed Personality Disorder, narcissistic and histrionic." A 1997 psychological evaluation by Dr. Adam listed diagnoses of "Major Depression (recurrent), Polysubstance Abuse, Sexual Sadism" and "Personality Disorder (NOS) with Borderline and Narcissistic Features." Dr. Adam's report also stated, "due to his sexual fantasies, [Rogowski] probably represents a moderate threat to women in a less structured environment." However, Dr. Atwood cautioned that Dr. Adam did not use any formalized risk assessment measures that would provide a more robust clinical assessment.

Dr. Atwood found Rogowski's sexual and criminal history consistent with the sexual sadism diagnosis. Rogowski "endorsed engaging in high-risk sexual activity, and endorsed deviant sexual behavior and thoughts." He reported having had approximately "under a hundred" sexual partners, then amended the estimate to "more like sixty." He confirmed a statement he

---

9 According to Dr. Atwood, the DSM-IV-TR (Diagnostic and Statistical Manual of Mental Disorders with Text Revision, Fourth Edition) defined the diagnostic criteria for sexual sadism as: "Over a period of at least six months, recurrent, intense sexual arousing fantasies, sexual urges, or behaviors involving acts (real, not simulated) in which the psychological or physical suffering (including humiliation) of the victim is sexually exciting to the person. The person has acted on these sexual urges with a nonconsenting person, or the sexual urges or fantasies cause marked distress or interpersonal difficulty." (Italics omitted.)

made to Dr. Barsman in his initial, 1992 psychological evaluation that: "His sexual fantasies involve both men and women and he describes them as involving blood, gore, and disgusting sex. He sees these as visions with soundtracks that are sent by Satan's Angels with spiritual warfare going on within him." He also confirmed his statement to Dr. Adam in 1997 that "he was very obsessed with pornographic literature of a bondage nature, including humiliation of the victim." Dr. Atwood concluded: "The specific activities of the life crime do appear to have been motivated by sexual deviance. There is documented / reported evidence that the inmate has experienced a six-month period of 'recurrent, intense sexually arousing fantasies, sexual urges or behaviors' associated with meeting diagnostic criteria."

Turning to the question of whether Rogowski met the criteria for a personality disorder, Dr. Atwood found Rogowski "presented as self-focused, unable to identify genuine weaknesses or flaws, interpersonally exploitative, lacking empathy, unstable and intense relationships, impulsivity, manipulative behavior, and recurrent suicidal behaviors, consistent with Narcissistic and Borderline personality traits, consistent with [*sic*] a non-specific personality disorder."[10] He observed that Rogowski's personality structure "exhibited a noteworthy level of psychopathy."

Dr. Atwood did not find Rogowski to be a reliable or credible historian. He observed that while Rogowski reported regret for his criminal conduct,

---

10    As explained in the 2019 CRA, "Borderline Personality Disorder is 'a pervasive pattern of instability in interpersonal relationships, self-image, and affects, and marked impulsivity," while "Narcissistic Personality Disorder is defined as 'a pervasive pattern of grandiosity (in fantasy or behavior), need for admiration, and lack of empathy.'"

"his regret and remorse appeared self-focused and was based more in how the life crime has impacted his life, rather than a result of an internal, emotionally-based sense of empathy for the victim and those close to her." When he was asked to describe the events of his crimes, his description was "detached and impersonal." He also tended to "intellectualize his role in the commission of [the] life crime." Dr. Atwood concluded that, although Rogowski made progress while in custody, he possessed an inadequate level of insight into the causative factors of his life crime, among which were his "deviant sexual obsession (dominance/humiliation)," "power and control issues," and "lacking a more objective view of his role in his relationships."

Rogowski's score on the Static-99, an instrument designed to assist in the prediction of sexual and violent recidivism for individuals with a history of sexually-related offenses,[11] placed him in the "low-moderate range" for sexual recidivism. (Underline, boldface and capitalization omitted.) Dr. Atwood opined that Rogowski presented "a relatively moderate risk for violence in the free community." (Underline, boldface and capitalization omitted.)

B.    *2011 Board Decision*

The Board denied Rogowski parole in 2011 and determined that public safety required a period of incarceration for seven additional years before the

---

[11]    Dr. Atwood explained, "The Static-99 looks at the following risk factors: presence of prior sexual offenses, having committed a current non-sexual violent offense, having a history of non-sexual violence, the number of previous sentencing dates, chronological age group, presence/absence of male victims, having [never] lived with a lover for two continuous years, having a history of non-contact sex offenses, having unrelated victims, and having stranger victims. . . . 'Recidivism estimates provided by the Static-99 are group estimates based upon reconvictions and were derived from groups of individuals with these characteristics.' "

next parole hearing.[12]  The Board found Bergsten's rape and murder were "heinous, cruel and callous crime[s]" and that Rogowski's moderate risk for violent recidivism was "much too high."  It commended him for his rehabilitative programming and that he had not received "a write up in about ten years," although it expressed concerns about the 1998 CDC-115 rule violation and the six CDC-128A write-ups.[13]  The Board stated it was particularly troubled by Rogowski's lack of insight into his "long time [diagnosis] of sexual sadism" and his response, "I don't know," when asked

[12]   Penal Code section 3041.5, subdivision (b)(3), provides:  "The board shall schedule the next hearing, after considering the views and interests of the victim, as follows: [¶] (A) Fifteen years after any hearing at which parole is denied, unless the board finds by clear and convincing evidence that the criteria relevant to the decision denying parole are such that consideration of the public and victim's safety does not require a more lengthy period of incarceration for the inmate than 10 additional years. [¶] (B) Ten years after any hearing at which parole is denied, unless the board finds by clear and convincing evidence that the criteria relevant to the decision denying parole are such that consideration of the public and victim's safety does not require a more lengthy period of incarceration for the inmate than seven additional years. [¶] (C) Three years, five years, or seven years after any hearing at which parole is denied, because the criteria relevant to the decision denying parole are such that consideration of the public and victim's safety requires a more lengthy period of incarceration for the inmate, but does not require a more lengthy period of incarceration for the inmate than seven additional years."  (See § 3041.5, subd. (b)(3)(B).)  Further undesignated statutory references are to the Penal Code.

[13]   "A CDC 115 is issued to a prisoner when alleged misconduct is believed to be a violation of law and not minor in nature."  (*In re Johnson* (2009) 176 Cal.App.4th 290, 294, citing Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).)  A CDC-128A Custodial Counseling Chrono is "issued when 'minor misconduct recurs after verbal counseling or if documentation of minor misconduct is needed.' "  (*In re Perez* (2016) 7 Cal.App.5th 65, 75, fn. 6.)  We discuss the specifics of Rogowski's institutional behavior *post*, at Section VII.

why he did not stop and let Bergsten go after the hours-long rape. The Board stated, "That's scary in view of the heinousness of this crime and the exceptionally callous disregard for [Bergsten] and the fact that she was [essentially] . . . tortured."

C.    *2015 CRA*

In preparing the 2015 CRA, Dr. Hoyt interviewed Rogowski, then 48 years old, for "at least" three hours. Dr. Hoyt concluded, consistent with Dr. Atwood, that Rogowski met the criteria for (1) alcohol use disorder, in sustained remission, in a controlled environment; (2) sexual sadism disorder, and (3) narcissistic personality disorder with borderline and antisocial features.

Dr. Hoyt found Rogowski met the full diagnostic criteria for sexual sadism disorder "based on recurrent and intense sexual arousal from the physical or psychological suffering of another person, both before and after the commitment offense." She had considered the "[i]n full remission" qualifier based on Rogowski's "not acting on urges with a non-consenting person or displaying distress or impairment in this regard for at least the past five years." She rejected the qualifier, however, noting that "his disorder developed *over years*, and his desired target population [i.e., women] is inaccessible while he is in prison." (Italics added.) She referenced, for example, Rogowski's statement to Dr. Adam in 1997 that "he was obsessed with pornographic literature of a bondage nature, including humiliation of the victim" and that he admittedly lied to the probation officer "that the victim had similar fantasies and that she had enjoyed the experience." As a result, she concluded the "[i]n a controlled environment" qualifier was more appropriate.

31

Dr. Hoyt also found Rogowski met the diagnostic criteria for narcissistic personality disorder with borderline and antisocial features. She observed that "[h]e has a history of displaying a pervasive pattern of grandiosity with a need for admiration and a lack of empathy for others, as evidenced by a history of maintaining a grand sense of self-importance, requiring excessive admiration, being preoccupied with power and unlimited success, and believing that he is special; further his display of reoccurring suicidal gestures, inappropriate and intense anger; and difficulty controlling his anger reflect chronic borderline features, while his failure to conform to the social norms of society, deceitfulness, repeated lying, and a reckless disregarding for the safety or self or others are antisocial components."

Dr. Hoyt ruled out any major mental disorder and concluded that, after meeting Rogowski, it was her opinion "that it was unlikely he was ever psychotic or delusional (beyond any substance-induced transient state)" but rather, "[h]is mental health issues appear to be characteriologically-driven, by his narcissism and grandiosity." She opined that his history suggested "lying and deceit have been characteristic of his interactions with others, as evidenced by the various versions of the commitment offense[s] he has told. At the time of [her] interview, he also presented as relatively glib and grandiose. He has a history of attitudes and behaviors that suggest a dearth of empathy and a callous disregard for the feelings and rights of others. . . . His behaviors have often been impulsive and irresponsible. He expresses remorse for his crime, although the depth of his sincerity is equivocal" and "at the same time he appears as rather unemotional and intellectualizing." She observed that "[i]t seems as though he wanted to place himself in as many 'victim' situations as he could during th[e] interview."

32

When asked "why this crime occurred," Rogowski responded, "I was completely deluded, and had convinced myself into believing that [Bergsten] ruined my chances of having a family. I complete[ly] blamed and villainized her. I just wanted the pain to stop. I got myself into a dangerous situation, and didn't know how to stop. I was locked into power and control. I think I chose rape because I didn't know of any other way to hurt a person than doing that." Dr. Hoyt acknowledged Rogowski had gained "additional" insight into his crime but believed "his insight remain[ed] deficient into himself and into the depth and extent of his characterological problems, particularly his narcissism."

On the Static-99, Rogowski scored equal to or higher than approximately 48 percent of other sex offenders, placing him in the "low-moderate risk category relative to other sex offenders." (Italics and capitalization omitted.) Rogowski's age of 48 "slightly" reduced his overall risk on the Static-99, as "there is a steady decline in recidivism rates for offenders after the age of 40." Dr. Hoyt's overall opinion was that he represented "a [m]oderate risk for violence." (Italics, underline and boldface omitted.)

D.    *Rogowski's Rebuttal to the 2015 CRA*

The 2015 CRA provoked Rogowski to author a sharp, 28-page typewritten rebuke of Dr. Hoyt's assessment. The presiding commissioner at his 2019 parole hearing said Rogowski's rebuttal "oozed narcissism." In the rebuttal, Rogowski accused Dr. Hoyt of being biased, unethical, and insulting, among other things.

Rogowski challenged Dr. Hoyt's factual accuracy on a myriad of matters, including many he would later admit were true. For example, he disputed saying he stalked McClain. Then at the 2016 parole hearing, for

which Dr. Hoyt prepared this CRA, he admitted his conduct "definitely border[ed] on stalking behavior," like "pa[ying] people to kind of monitor who [McClain] was dating, what she was doing," and that he "was insane with jealousy and resentment and just want[ed] to control and have power over her."

He rejected every diagnosis that Dr. Hoyt reached. For example, he disagreed with her diagnosis of narcissistic personality disorder with borderline and antisocial features, claiming he "met none of the criteria" for this diagnosis, asserting he "knows he is not special, and his approach to life is no longer ego-driven," and stating that "[h]e is a self-realized and humble person with over 2 decades of solid personal transformation." He asserted Dr. Hoyt "mistook [his] passing responses as to past and present accomplishments as 'grandiose', instead of doing the requisite research to determine the validity of them." (Underline omitted.) (However, when the Board at his 2016 parole hearing asked if he agreed with Dr. Hoyt's assessment that "his mental health issues appear to be characterologically driven by his narcissism and grandiosity," Rogowski testified, "I would agree with that, yes.")

Rogowski's most strenuous objection was to Dr. Hoyt's sexual sadism disorder diagnosis. Asserting he "has not met the most basic criteria (and surely not the full criteria)" for sexual sadism disorder, he disputed whether he had experienced symptoms of sexual sadism for at least six months as required to meet the duration requirement for this diagnosis. He claimed the extent of his pre-offense interest in sexual sadism was limited to a "<u>very brief experimentation with fantasy of simulated bondage (not sadism) with his ex-fiancée</u>." Despite previously confirming his statement that "he was very obsessed with pornographic literature of a bondage nature, including

34

humiliation of the victim" when interviewed by Dr. Atwood for the 2009 CRA, in the 2015 rebuttal he claimed his actual statement was that he viewed "a magazine which depicted models resembling himself and his ex-fiancée for a period of three to six weeks immediately prior to his commitment offense." And, although when questioned by Dr. Atwood he impliedly acknowledged the accuracy of a July 1992 initial psychiatric evaluation stating that "[h]is sexual fantasies involve both men and women and he describes them as involving blood, gore, and disgusting sex," in the rebuttal, Rogowski claimed for the first time that the evaluation was "erroneous" and faulted Dr. Hoyt for relying on it.

He further argued "[o]nly by a stretch could this full diagnosis be applied to [him]," that "once committing rape does not alone qualify him as sadistic," and although his "thoughts in those 3-6 weeks before his crime of raping . . . Bergsten" may meet some of the sexual sadism criteria, "he was never sexually aroused by her suffering, nor by the act—quite the opposite." (Underline omitted.) In his view, "it is preposterous to . . . label [him a sexual sadist], not only due to the absence of such symptoms in him for 24 years, but particularly when his responses stated an absence of any sadistic symptoms, of normal sexual attitudes, having nothing to do with sadistic arousal."[14]

Finally, he also took issue with Dr. Hoyt's use of the "[i]n a controlled environment" qualifier to signal that his desired target population was not

_____

[14]    A 1992 psychological evaluation stated, "Rogowski volunteered he is often confused with sexual ideation. . . .  [He explained] "his heterosexual contacts had become increasingly 'kinky.'  He spoke of sadism/masochism, discipline and bondage and other sexual behavior, including the use of pornography which had increasingly been his preference.  There seems to be a trend where women have become more sexually exploited in his sexual interactions."

available to him in prison. He argued he "has never had any such 'desired target population' aside from his ex-fiancée and [the] victim." He claimed that he had made amends with his ex-fiancée, and "because his victim, . . . Bergsten, has been deceased for 24 years, she could not ever be at risk."

E.    *2016 Board Decision*

At the 2016 parole hearing,[15] the Board found Rogowski unsuitable for release for another seven-year period. Although it found "some circumstances" tended to show he was suitable for release (including that he did not have a significant history of violent crime as a juvenile or an adult and he lacked "any serious" CDC-115s during his incarceration), the Board found they were "far outweighed" by circumstances of unsuitability.

The 2016 Board found the manner of the life crime to be "heinous, horrific, [and] monstrous." It was also concerned with his pattern of reactions to "failed relationships," including cutting himself when a prior girlfriend ("Lynn") broke up with him, as well as his "sadomasochist" sexual and homicidal ruminations about McClain, culminating in Bergsten's rape and murder. The Board did not find Rogowski credible, pointing to the "inconsistencies" in his description of the commitment offenses, his evasiveness and lack of answers to the "hard questions," and his history of

_____

15    Although the Board issued a seven-year denial at the 2011 hearing, pursuant to section 3041.5, subdivision (d)(1), "An inmate may request that the board exercise its discretion to advance a hearing set pursuant to paragraph (3) of subdivision (b) to an earlier date, by submitting a written request to the board, with notice, upon request, and a copy to the victim which shall set forth the change in circumstances or new information that establishes a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration of the inmate." An inmate may make only one such written request each three-year period. (§ 3041.5, subd. (d)(3).)

dishonesty. Lastly, the Board found he lacked insight into who he was, why he committed "such a deplorable crime," and "why [he was] such a dangerous person." Again pointing to his lack of credibility, the Board stated, "And if you didn't know who you were back then, how do we know and how do you know who you are right now," and concluded "that's what really makes [Rogowski] a current unreasonable risk to the public."

F.      *2019 CRA*

Dr. S. White prepared the 2019 CRA, when Rogowski was 52 years old. Dr. White reviewed Rogowski's prior psychological evaluations from 1992 through 2016, including two performed by private psychologists retained by defense counsel in 2010 (by Dr. B.P. Stark) and 2016 (by Dr. D.R. Korpi). Dr. White also noted "there have been inconsistencies" in Rogowski's description of the life crime and reporting of his psychosocial history across the probation officer's report, the previous CRAs, and the two private psychological evaluations. (Italics omitted.)

Dr. White found Rogowski "polite and superficially cooperative" in the interview, but "consistent with the 2015 CRA, he attempted to control the flow [of] the interview." She found Rogowski's mood to be neutral and his affect within normal limits, but noted the 2009 CRA's description that he was "detached and impersonal" and the 2015 CRA's description that he was "rather unemotional and intellectualizing" when discussing the crimes. She contrasted these observations with Dr. Korpi's statement, "seldom have I come upon a man so excruciatingly difficult to hear out, his pain and regret so palpable that I hardly wanted to make eye contact." However, during her own evaluation, Dr. White observed that Rogowski "displayed some behavioral manifestations of crying, including sniffling and making sobbing

noises, so much so that [Dr. White] provided him with tissues." Yet "upon observation," Dr. White noted "there did not appear to be any visible tears."

Like the prior psychologists, Dr. White found Rogowski met the diagnostic criteria for alcohol use disorder, in sustained remission in a controlled environment, and for narcissistic personality disorder with borderline and antisocial features. However, she determined the DSM-5 paraphilic disorder of "Other Specified Paraphilic Disorder (Sexual Sadism over a period of *less than six months*), in remission, in a controlled environment"[16] to be appropriate with "all of the available information" to her. (Some italics omitted.) Dr. White noted the full sexual sadism disorder diagnosis in the prior CRAs "was not upheld" in the two psychological evaluations privately undertaken by Dr. Stark in 2010 and Dr. Korpi in 2016. She also appeared to credit Rogowski's statements he had only "a brief period of viewing 'B&D' [(bondage and dominance) pornography], which lasted no more than six weeks"; that "the images did not involve suffering and that he never experienced pleasure from the suffering of another person"; and that "he did not take pleasure in the victim's suffering," although he acknowledged he knew he wanted "to humiliate" Bergsten and "for her to feel [his] pain."

---

16    According to the 2019 CRA, the DSM-5 (Diagnostic and Statistical Manual of Mental Disorders (Fifth Edition) criteria for a sexual sadism diagnosis are: "Over a period of at least six months, recurrent and intense sexual arousal for the physical or psychological suffering of another person, as manifested by fantasies, urges, or behaviors. The individual has acted on [*sic*] with a nonconsenting person, or the sexual urges or fantasies cause clinically significant distress or impairment in social, occupational, or other important areas of functioning."

Nevertheless, Dr. White agreed with Dr. Hoyt that Rogowski posed a "[m]oderate risk for violence" if released in the free community. Dr. White concluded these historical factors remained moderately relevant to assessing Rogowski's risk for violence: (1) substance use, which "would have great significance and consequence if he were to return to using substances in the future"; (2) the extreme violence in his life offenses; (3) his personality disorder or personality structure; and (4) his sexual sadism disorder (over a period less than six months). Notably, Dr. White concluded Rogowski's relationship issues, which included a history of instability in his romantic relationships, remained "highly relevant" to his risk for violence.

Looking at Rogowski's "behavior and functioning within the last few years, with an emphasis on more recent functioning," Dr. White emphasized "one predictive factor for recidivism remains relevant to formulating what has caused [ ] Rogowski to perpetrate violence in the past and how to prevent such violence in the future": insight. She noted that Rogowski demonstrated acceptance, responsibility and remorse for his actions in discussing "his version of the controlling offense," and conveyed an understanding of "some of the personal, interpersonal, and contextual factors that contributed to his violent behavior at that time (e.g., rage, selfishness, entitlement, impaired judgment due to substance use, etc.)." However, she found "his insight into his ongoing personality pathology and how these factors may impact his future decision-making and behavior remains limited."

Finally, Dr. White also considered that Rogowski was a youthful offender, but opined that "his actions during the life crime were quite extreme, and beyond what would be considered 'hallmark' for a juvenile/young adult." Rogowski's Static-99 score was higher than approximately 32 percent of sex offenders, placing him in the average risk

39

category. She cautioned, however, "Rogowski continues to display several historical and current factors that are relevant to his risk of future violence. Of note, his placement score . . . does not accurately reflect his violence risk potential in the community, due to the individual case factors discussed in [her] report."

Although neuropsychological testing was outside the scope of her evaluation, Dr. White found it "worthwhile" to discuss Rogowski's reported history of multiple head traumas. Rogowski stated he had been dropped as an infant, and that from childhood through early adulthood he "experienced numerous head injuries from falls, skateboarding accidents, and other risk-taking behavior, resulting in several instances of loss of consciousness and concussions." He reported a 1990 "near-fatal accident in Germany when he fell from the second story of a hotel and landed on a spiked fence." He stated this incident made him decide to quit drinking "cold turkey," and he subsequently experienced "behavioral changes, including instability in his thinking, becoming 'addicted to [his] relationship with . . . McClain,' and delving into an[ ] extreme form of Christianity, becoming a 'born-again zealot.' "

Dr. White's review of his medical records did not reveal that he underwent neuropsychological testing at the time of the Germany accident, nor that he received treatment for alcohol withdrawal. Accordingly, it was her opinion that the "etiology of his behavioral changes [as reported by Rogowski] remains largely unknown." She noted Dr. Stark's 2010 opinion that "Rogowski's diametrically opposed behavior after his near fatal injury in German[y] was due to brain damage he suffered," but highlighted that Dr. Stark's own battery of neuropsychological tests revealed the opposite. Dr. Stark's report stated: The results of the tests "demonstrate the head

trauma resolved with time. To be sure, the test performances does [*sic*] not indicate the existence of current brain damage."[17] Dr. White concluded, "[n]o evidence of psychotic symptoms, mood issues, or other signs of major mental illness have been noted in available records" and she did not see any "overt signs or symptoms of a severe mental disorder" during her clinical evaluation.

G.     *2019 Board Decision*

Although the 2016 Board issued a seven-year denial, Rogowski went before the Board for a third parole hearing in 2019.[18] This time the Board found Rogowski suitable for parole. It began its reasoning by acknowledging that current law required it "to give great weight to the mitigating effects of the diminished culpability of youth as compared to adults, the hallmark features of youth, any subsequent growth in maturity or increased maturity in reviewing [Rogowski's] suitability for parole," calling it a "[n]ew wrinkle" it did not have last time. This Board panel did not confront Rogowski about the details of the rape and murder.

H.     *First Reversal by Governor Newsom*

Governor Newsom reversed the Board's 2019 parole grant and, in 2020, this court upheld his decision when we summarily denied Rogowski's petition for writ of habeas corpus.[19] The Governor gave great weight to Rogowski's diminished culpability as a youthful offender but noted the forensic

---

[17]     At his 2016 parole hearing, Rogowski testified that any CAT scans or MRIs he has had were "all inconclusive."

[18]     See section 3041.5, subdivision (d)(1) and (d)(3) and footnote 15, *ante*.

[19]     Our summary of the Governor's reversal is taken from our order summarily denying the petition.

psychologist who prepared the CRA for the parole hearing had characterized Rogowski's actions during the rape and murder as " 'quite extreme,' and beyond [what] would be considered 'hallmark' for a juvenile/young adult." The Governor acknowledged Rogowski's rehabilitative efforts, including vocational training and therapy and classes to address violence and sexual issues, and lack of serious disciplinary problems in prison. But he found that these positive factors were outweighed by negative factors showing unsuitability for parole.

The Governor found the crimes "involved a high degree of callousness and brutality" and, despite many years of incarceration, "Rogowski appears to still have only a superficial understanding of what triggered him to inflict prolonged sexual violence on his victim and then kill her." The Governor relied on the forensic psychologist's diagnosis of Rogowski as having sexual sadism, a diagnosis which Rogowski strongly disputed and which the psychologist considered relevant to the rape and murder, and also a current relevant factor that elevated Rogowski's risk of future violence to moderate.

## VII.

### *2022 CRA and Parole Hearing*

Rogowski was again considered for parole in June 2022,[20] when he was 55 years old and had been incarcerated for 31 years. Here we summarize the 2022 CRA prepared by Dr. Tobin and the 2022 parole hearing.

---

[20] The parole hearing commenced in May 2021 but was continued after the panel determined during the hearing that a decision regarding parole could not be made.

A.    *2022 CRA*

    1.    *Rogowski's Institutional Behavior, Rehabilitative Programming and Parole Plans*

There have been no documented instances of Rogowski being the perpetrator of overt violence during his incarceration. In 1998, he was found guilty of one CDC-115 rule violation for "Conduct/Disruptive Behavior" and, between 1992 and 2001, he received six CDC-128A Custodial Counseling Chronos, including two for physical altercations. In July 2021, Rogowski received two CDC-115 rules violation reports (RVRs), one for "unauthorized acquisition of personal property" and another for "forgery of an official document which could affect term" (boldface and capitalization omitted), but he was found not guilty in both instances. In 2021, he received two "compatibility chronos," each relating to resolution of a conflict with another inmate. (Capitalization omitted.)

Regarding the 1998 CDC-115 rule violation, Rogowski admitted he "lost [his] temper" with a correctional officer and said some disrespectful things to him, including "Why don't you strip me completely out, blow me. You can strip me, you can blow me." The 128As included Rogowski "fighting" in 1992 and another "physical altercation" in 1993; "it seems that [he] was the identified victim in each of those altercations." A few 128As had "similar themes" for disrespect towards a staff member, including a 2000 incident in which he refused to stand for count and told the correctional officer, "Get the fuck out of my door." In the 2001 incident, he admittedly "lost [his] temper" with a kitchen staff member and was disrespectful.

The July 2021 RVRs were both authored by supervisors in his assignment as a clerk in the mental health building. Rogowski said he filed a complaint against a female supervisor whom he felt was making "overfamiliar comments" towards him and, after the female supervisor was

43

removed from her position, the remaining officers wrote up "essentially false/misleading" RVRs. As mentioned, he was found not guilty in both instances.

According to the September 2021 compatibility chrono, Rogowski reported to a correctional officer he was the victim of a "PREA" (Prison Rape Elimination Act) by an inmate, R. Allen. Rogowski told correctional officers that Allen's loud music caused him to lose 30 minutes of a scheduled visit because he was unable to hear the announcement over the PA system. Rogowski "verbally confronted" Allen when he returned from his visit. Allen then got in Rogowski's face and caused Rogowski to "nearly los[e]" his balance when he stepped back away from Allen. At this time, Allen "thrusted his lower stomach against [Rogowski]," making "direct contact with his gro[i]n, specifically . . . his [genitals] (clothed)." When Rogowski fell back on his bunk, Allen leaned over him and tried but failed to punch him with his right fist. Another cellmate intervened and stopped the altercation. In a follow up interview, Rogowski "recanted his previous allegations of being the victim of PREA" and admitted he engaged Allen which escalated into an unintentional physical altercation and accidental contact with his genitals.

According to the December 2021 chrono, Rogowski and another inmate, L. Siddell, had a "verbal altercation" and the two were interviewed to determine whether they had "any animosity" towards each other. Both inmates independently stated there had been a "misunderstanding," they did not consider each other enemies, and could remain housed together without any issue.

Rogowski told Dr. Tobin that both incidents in 2021 "essentially involved the other party sexually harassing" him over a period of time and culminated in the other party physically attacking him. He stated he signed

44

both chronos "to avoid placement in segregation and removal" from his program. He acknowledged the earlier, more remote incidents reflected his "problematic thinking and 'personality' " in interactions with prison staff.

Rogowski has engaged in numerous rehabilitation programs, both as a participant and developer/facilitator in topics, including for example, anger management, creative conflict resolution, domestic violence, AA/NA, understanding antisocial and maladaptive patterns, alternatives to anger and family violence. He also completed independent studies in the areas of domestic violence, narcissism, empathy, rape/sexual addiction, and head trauma. In 2019, he formed a peer-to-peer education program focused on gender-based abuse prevention. He reported work with outside sponsors with Sexaholics Anonymous (SA) and Sex Addicts Anonymous (SAA) and completing numerous self-directed rehabilitation courses during the COVID-19 pandemic.

During his incarceration, Rogowski obtained a Bachelor of Arts degree, a paralegal/legal assistant diploma, and vocational certificates in an alcohol and drug studies specialist course, electronics, upholstery, dry cleaning, machine shop practices, and office services and related technologies.

He has been employed in various prison work assignments, including as yard crew/landscaper, machine operator, teacher's aid/clerk/porter jobs, library assistant, and dog trainer. He has received "uniformly positive ratings" from his work supervisors "for many years," including "laudatory chronos" referencing his positive performance, character, self-development, and positive programming." One correctional officer in April 2018 described his behavior "as marked by integrity, honesty, and respect" and commended his " 'helping presence among the population' " and "safe interaction with all staff." However, in Rogowski's last assignment as a mental health building

clerk he was removed at the request of his supervisor. His final work supervisor's report in August 2021 "reflected negative ratings and comments, essentially reiterating the misconduct alleged" in the unsubstantiated July 2021 RVRs. His previous work supervisor in this assignment reported in October 2020 "satisfactory ratings and positive comments."

Rogowski's parole plans included various options for transitional housing and a program that supports reentry for sex offender registrants. He described plans for work with a non-profit and outlined a range of support available to him in the community, including family, friends, and sponsors. He stated he would continue with AA, SA, and SAA in the community. He was able to describe potential triggers for substance use that would put him at risk for relapse and strategies for managing an intimate relationship "should one occur in the community." He identified "jealousy" and "un-forgiveness" as the trait he needed to remain "most vigilant about." Dr. Tobin believed Rogowski's plans were "thorough, personalized, and addressed risks and management strategies for [his] essential liabilities."

2.    *Clinical Assessments*

Dr. Tobin examined Rogowski about the commitment offenses. In response to the question, "*what led [him] to commit this crime?*," Rogowski responded: "[J]ust my pathological sense of self-importance, . . . having a pattern of relationships where I was given anything I want, . . . choosing partners that were submissive, . . . never feeling legitimate in my life because of my father's abandonment, my mother's coddling, not letting me play with the big boys, . . . Never developed healthy adult self-esteem and agency. . . . [¶] I had a drastic overreaction, really compulsive in my thinking that someone had hurt me, and had to be punished. . . . I was enabled in the misogyny, that women meant less than men, that their lives meant less, that

46

bodies and boundaries meant less. . . . [¶] Alcohol and codeine affected my inhibitions, thinking it was ok to try this BDSM experience on [Bergsten] . . . impulsivity and compulsivity with sex growing up, . . . led me to being open to . . . deviant sex . . . BDSM." (Italics added.)

When Rogowski stated he "really wanted to hurt" Bergsten, Dr. Tobin asked, "*Do you mean harming her sexually or killing her?*" He responded, "Not killing, but the sexual aspect had been bouncing around in my mind like a ping-pong." Dr. Tobin then asked, "*Why hit her in the head rather than just ask if she was interested in that kind of sexual activity?*" He answered, "It wasn't about getting my rocks off, [it was] about getting my revenge on her. It was more about violence than about sex. I spent half the night cussing at her and reciting scriptures about her being a harlot, prostitute . . . talking about filthy rags of prostitution. Railing on her verbally. That's what is most pronounced in my memory of that night, in addition to the rape."

And, as mentioned, when Dr. Tobin asked, "*You've depicted killing her as sort of incidental to quieting her, but how else did you think it would end?*" Rogowski responded, "I don't know, I don't know. [I] just didn't care, just didn't give a damn about the consequences. This was my depravity, not caring about a human life. Had I been sober, I would have had that self-check mechanism; 'wait a minute, call 911, cut your losses.' Wish I could say I had a plan, a specific plan but I didn't." In Dr. Tobin's view, Rogowski's discussion of the various factors contributing to his life crime "evidenced self-awareness."

Dr. Tobin opined that Rogowski met the criteria for (1) alcohol use disorder, in remission in a controlled environment; (2) other specified personality disorder, narcissistic features; and (3) sexual sadism over a period of less than six months, in remission, in a controlled environment.

47

She found insufficient criteria to qualify Rogowski for the full narcissistic personality disorder diagnosis, which according to the DSM-5 requires the disorder be pervasive across a broad range of personal and social situations and should lead to significant distress or impairment in social, occupational or other important areas of functioning. In her opinion, a review of Rogowski's rehabilitation and conduct "for several years" suggested the traits are "no longer paramount" to his interactions with others, "or that at least [he is] self-aware enough to address issues as they occur."

Relevant to the sexual sadism diagnosis, Rogowski told Dr. Tobin he was exposed to pornography "from a young age (5 years)" at various homes he spent time in, continuing through adolescence in the context of his sexual relationships. He reported having had 10 sexual partners in his lifetime. (This statement stands in contrast to Rogowski's report to Dr. Atwood in the 2009 CRA that he had approximately "under a hundred" sexual partners, which he then amended to "more like sixty.") At 16, his travel to other countries exposed him to "a wider variety of pornography, and that use of such materials became more compulsive." He denied engaging in "bondage themed sexual practices" in any of his sexual encounters. He stated the handcuffs he used to bind Bergsten were a birthday gift from a girlfriend, and they were given to him "more as a joke rather than an addition to [his] sexual practices."

Rogowski reported his "growing anger towards [McClain] subsequent to their breakup" was "in tandem with a preoccupation with BDSM (bondage, discipline, sadism, masochism) sexual fantasies." He stated the more he repressed his sexuality because of his newfound religious beliefs, "the more [he] began having interest in BDSM, fixating on this article [in a magazine]." He "started having the deviant S and M kind of thoughts." He "estimated

48

such thoughts had been occurring for up to three months prior to the life crime." His thoughts and actions towards McClain became more violent, including punching a hole in the wall with her present and going to her house "with homicidal rage in [his] mind." (These statements contradict his typewritten 28-page rebuttal to the 2015 CRA. In rejecting Dr. Hoyt's full sexual sadism disorder, he claimed he had only a "very brief experimentation with fantasy of simulated bondage (*not sadism*) with his ex-fiancée," *three to six weeks* before Bergsten's murder. [Underline omitted, italics added.])

Dr. Tobin affirmed the 2019 CRA's diagnosis of sexual sadism over a period of less than six months, but she did so "with an important caveat." She stated: "This diagnosis essentially hinges upon M. Rogowski's self-report of the onset of [his] BDSM preoccupations, given the six months timeline required to meet the diagnostic criteria. *This examiner questions the likelihood of such a sudden, rapid onset of sadistic ruminations, given the culmination in a sexual homicide, a most extreme outcome.* More typically, sadistic tendencies may emerge to a lesser degree at an earlier stage of sexual development, with a more gradual increase in sexually sadistic behaviors over time." (Italics added.)

Dr. Tobin also explored Rogowski's reported history of multiple head traumas in her diagnostic analysis. In particular, she noted the head trauma from the Germany accident described by Rogowski "appears to have been followed by a rather abrupt change in behavior, although whether this was a consequence of neurological damage or a near death experience is difficult to speculate." She acknowledged "[i]t is plausible that such an injury could contribute to disinhibition, as well as impaired decision-making and perhaps any number of angry, erotic, or hyper religious ruminations." Thus, in questioning the likelihood that Rogowski's sadistic ruminations could emerge

49

so rapidly, as Rogowski self-reported, Dr. Tobin considered it "possible that [his] brain trauma, and consequent disinhibition, contributed to the more rapid onset of such ruminations and their extreme outcome." Dr. Tobin emphasized, however, "this remains very speculative." Like Dr. White, Dr. Tobin cautioned that "a definitive neurocognitive diagnosis is beyond the scope of this examination."

3.      *Risk for Future Violence*

Dr. Tobin warned that "[w]ith access to potential intimate partners in the community, . . . Rogowski's sexually deviant preoccupations could re-emerge." This possibility, she observed, is "moderately mitigated by [Rogowski's] self-awareness, several accountability partners in the community, and advancing age." She also noted that, although Rogowski has avoided violence during his term of incarceration, the "risk for violence against women cannot be entirely predicated on the absence of violence in a male prison environment." Thus, she opined that Rogowski's history of sexual violence remains moderately relevant to his risk for violence in the free community. And given Rogowski's violent reaction to the dissolution of an intimate relationship, and that this factor is also to "some extent untested in a male prison environment," Dr. Tobin opined the relationship factor remains moderately relevant to risk despite relevant programming and increased self-awareness.

In analyzing Rogowski's risk factors for violence, Dr. Tobin was also concerned by Rogowski's 2021 altercations with other inmates. For her, the altercations reflected a "lapse in judgment regarding . . . Rogowski's decision to remain in circumstances that were evidently threatening for him." Although she believed "[o]n the balance" this singular concern was moderately less relevant to risk considering the totality of Rogowski's work in

50

self-awareness, she stated the judgment errors were "problematic in prison and in the community,"

Rogowski scored higher on the Static-99 than approximately 48 percent of sex offenders in the standardization sample, placing him in the average risk category relative to other sex offenders. His score reflected that his anticipated age at release, 55 years old, "slightly diminishes" his risk of sexual re-offense. Dr. Tobin concluded in her overall assessment that Rogowski presented a low risk for violence.

B.  *2022 Parole Hearing*

At the 2022 parole hearing, Rogowski acknowledged the Governor's concerns that he inflicted prolonged sexual violence on Bergsten before killing her and that he lacked insight into "that particular aspect of the sexual nature of [his] crime." The Board questioned him about the reasons he raped and murdered Bergsten,[21] asked him for his current view on the sexual sadism disorder diagnosis, and what he had done to work on his insight since the 2019 parole hearing. He stated he had made "a little progress" in the two years since the Governor's reversal, including working with his sponsors in therapy and journaling. He agreed with the diagnosis of sexual sadism "under six months" and explained: "I just had rage that the sexual aspect . . . the crime was rooted in me being a sex addict for one and not being in touch with that." He also identified rage from childhood, exposure to bondage and dominance pornography "in that last month period before [his] crime," anger toward women, codeine and alcohol consumption, and a need for power and control, as causative factors.

---

[21]  Like the 2019 Board, the 2022 Board did not confront Rogowski about the details of the rape and murder. The 2021 Board did but adjourned without reaching a decision.

When asked to elaborate further, Rogowski stated that "people can be so angry that their actions are completely unexplainable" and some crimes "make[ ] no sense whatsoever." He testified, "We are often . . . mystified and, and confused and baffled by school shootings and . . . you know, Boko Haram, and . . . little girls being trafficked for sex." He said the degree of cruelty he inflicted on Bergsten "makes no sense, but that is the insanity for me of addiction . . . certainly porn addiction is that you will go to any extent to feel some sort of high, some sort of feeling better. . . . And as simple as that might seem, . . . really it was a wounded little child in me . . . an infant child primarily lashing out at the world."

The Board also questioned Rogowski about the incidents that were the basis of the 2021 compatibility chronos. When asked about the September 2021 incident, Rogowski stated he had a "bit of history" with Allen that went back to 2018, when Rogowski "made a PREA report on [Allen]." He said he initiated "a conversation" with Allen after he missed half an hour of his visit because Allen was "blaring loud rap recordings." He "asked [Allen] in the future if he could . . . use his headphones or turn his music down, . . . it would be great, so [he] can . . . hear the announcements on the PA." In response, Allen pushed Rogowski onto his bunk and was "pumping his pelvis into [him] on [his] bed and taking swings" at him. When the presiding commissioner asked Rogowski why he initially reported being a PREA victim but then recanted the allegation, Rogowski denied changing his story. He said he was in pain from shoulder surgery, was in a cold, filthy cell, and could not read the officer's report because he did not have his glasses. He said he believed he did not sign the report, but the report did not bear out this claim. He also claimed the correctional officer had used "boiler plate language" when preparing the report.

When questioned about the December 2021 incident, Rogowski claimed he had been attacked in the shower by a large man who threw a chair at him, and it "was actually a PREA report." He stated the watch sergeant did not want to do the paperwork a PREA report required, so the sergeant instead characterized the incident as a verbal altercation, which Rogowski said was "boilerplate language."

Rogowski apologized for becoming "combative" with the Board during these questions, stating it was "very frustrating" to have the incidents "mis-documented" and then to be questioned about it during his hearing when "it's something [he] thought [he] was past." The presiding commissioner told Rogowski that, from the panel's perspective, it was concerning that in the space of three months he had gotten into two verbal altercations with other inmates. Asked whether he believed there was anything he could have done differently, Rogowski responded, "Uh, not report." The presiding commissioner then asked whether Rogowski could identify anything else about his behavior that could have been an issue. Rogowski responded he could have followed through with the PREA investigations but he said this would have been "not nice" because it would have caused him to become isolated in administrative segregation.

The Board determined Rogowski was suitable for parole. It found there were factors that aggravated Rogowski's risk to the public, including his lack of self-control during the crime, antisocial response to anger, and callousness. However, it found these aggravating factors were outweighed by other factors that mitigated his current risk. The mitigating factors included Dr. Tobin's determination that Rogowski posed a low risk for future violence, as well as his criminal history, programming, institutional behavior, offender change, relapse prevention plans, and realistic parole plans. The Board also gave

"great weight" to Rogowski's youthful offender status.  As for his advanced age, the presiding commissioner noted, "It does appear you would be able to engage in violence similar to the life crime in the future should you choose to do so but we see how you have not, you have not repeated those behaviors in prison."

## VIII.

### Second Reversal by Governor Newsom

Governor Newsom reversed the Board's parole grant.  The Governor began by reciting the facts of the offense, including that Rogowski struck the victim in the face and head with a metal wheel lock, handcuffed her, carried her upstairs, shackled her, cut off her clothes, raped her for more than two hours, stuffed her into a bag while still shackled, choked her to death, drove her body to the desert, and buried her in a shallow grave.  He then acknowledged that Rogowski was 24 years old when he raped Bergsten and then murdered her, and noted that youth-related factors appeared to have been present for Rogowski at the time of the life crime, including "impulsivity, immature interpersonal coping strategies, recklessness, and a callous disregard for the consequences of [his] actions."  The Governor also acknowledged that Rogowski had participated in significant self-help programming, had earned five vocations, had enrolled in college courses, and was working as a service dog trainer.  The Governor commended Rogowski for taking these positive steps.

The Governor found, however, that these positive factors were outweighed by negative factors that demonstrated his unsuitability for parole.  The Governor stated, first, that Rogowski "recently demonstrated that [he] lack[s] the self-control and skills to prosocially navigate conflict." The Governor explained, "As documented in [his] risk assessment and at [his]

54

parole hearing, in 2021, Mr. Rogowski had two altercations with other incarcerated people that escalated and became physically threatening. Although Mr. Rogowski's conduct did not ultimately result in disciplinary action, [his] discussion of the incidents highlighted gaps in insight. . . . The stressors and conflict Mr. Rogowski will face on parole are different from those [he] face[s] in prison, but managing them will require skills and insight that I find Mr. Rogowski must do additional work to develop."

Second, the Governor found Rogowski also "must do additional work to deepen [his] insight into the nexus between [his] reported sex addiction and violent crime." The Governor observed that, at the parole hearing, "the Board asked Mr. Rogowski about the causative factors of [his] crime," and Rogowski had identified sex addiction as a causative factor in " 'the sexual aspect of . . . the crime.' " It was the Governor's view that "Rogowski's ability to connect [his] history of sex addiction to [his] sexual violence is a first step" but "Rogowski did not, however, indicate that [he] understand[s] the primary causative factor of the brutally violent aspect of the crime." The Governor found Rogowski "must do additional work to understand what led [him] to act so violently, and demonstrate more developed empathy."

The superior court denied Rogowski's petition for writ of habeas corpus challenging the Governor's reversal. Rogowski then filed a petition for writ of habeas corpus with this court, asserting that the Governor's reasons for reversing the Board's parole grant "offered no evidence [he] is currently dangerous." (Capitalization omitted.) We issued an order to show cause to consider the issues raised in the petition.[22]

---

[22]    In November 2024, while Rogowski's petition was pending, the Board considered Rogowski for parole and denied parole for three years. Citing *In re Lira* (2014) 58 Cal.4th 573, the Attorney General does not contend the

55

## DISCUSSION

### I.

### *Parole Suitability Determinations*

Parole suitability decisions are governed by section 3041 and Title 15, section 2402 of the California Code of Regulations.[23]  The regulations provide that, "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the [parole authority] the prisoner will pose an unreasonable risk of danger to society if released from prison."  (Regs., tit. 15, § 2402, subd. (a).)  Section 3041 states the parole authority "shall grant parole to an inmate unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual."  (§ 3041, subd. (b)(1).)  As a result, inmates in California have a due process liberty interest and "an expectation that they will be granted parole unless the [parole authority] finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation."  (*In re Rosenkrantz*

Board's 2024 unsuitability decision moots Rogowski's current petition.  (*Id.* at p. 582 [even when a court determines a gubernatorial reversal of a parole decision is unsupported, the proper remedy is to vacate the reversal, reinstate the Board's grant of parole, and direct the Board to conduct its usual proceedings for a release on parole, which allows the Board to account for any recent developments reflecting on the inmate's suitability for parole, and to rescind its grant if appropriate].)

[23]  Subsequent references to "Regs." are to the California Code of Regulations.

56

(2002) 29 Cal.4th 616, 653–654 (*Rosenkrantz*); see *Lawrence, supra*, 44 Cal.4th at p. 1191.)

The regulations specify the circumstances relevant to an inmate's suitability and unsuitability for parole that are to be considered by the parole authority. (Regs., tit. 15, § 2402, subds. (c)–(d).) The "circumstances tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison." (*Rosenkrantz, supra*, 29 Cal.4th at pp. 653–654, fn. omitted, citing Regs., tit. 15, § 2402, subd. (c).)

The "circumstances tending to establish suitability for parole are that the prisoner: (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (5) committed the criminal offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces the probability of recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release." (*Rosenkrantz, supra*, 29 Cal.4th at p. 654, citing Regs., tit. 15, § 2402, subd. (d).)

The Penal Code imposes additional considerations when the parole authority is determining parole for youthful offenders (those who committed their offenses at the age of 25 years or younger) and elderly inmates (those

57

who are 50 years or older) who have served a minimum of 20 years on their current sentence. (§§ 3055, 4801.) With youthful offenders, the parole authority "shall give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).) With "elderly" inmates, the parole authority "shall give special consideration to whether age, time served, and diminished physical condition, if any, have reduced the elderly inmate's risk for future violence." (§ 3055, subd. (c).)

Relevant here, an inmate's insight into his or commitment offense and other antisocial behavior is also a proper consideration in determining parole suitability. (*Shaputis II*, *supra*, 53 Cal.4th at p. 219.) As the California Supreme Court explained in *Shaputis II*, "the regulations do not use the term 'insight,' but they direct the [parole authority] to consider the inmate's 'past and present attitude toward the crime' and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense,' " making "these factors fit comfortably within the descriptive category of 'insight.' " (*Id.* at p. 218 [cleaned up].)

Lastly, the regulations provide that the relevant circumstances "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the [parole authority]." (Regs., tit. 15, § 2402, subds. (c), (d).) "Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (*Id.*, subd. (b).) Importantly, " '[t]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of . . . the Governor.' " (*Shaputis II*, *supra*, 53 Cal.4th at p. 210.)

58

" 'It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision.' " (*Ibid.*) "Only when the evidence reflecting the inmate's present risk to public safety leads to but one conclusion may a court overturn a contrary decision by . . . the Governor." (*Id.* at p. 211.)

## II.

*Sufficient Evidence Supports the Governor's Determination That Rogowski Currently Poses a Danger to the Public If Released*

Rogowski asserts the Governor's reversal of the Board's grant of parole was unlawful because, in his view, (1) the immutable facts of his life crime are no longer probative of his present risk to public safety, (2) the evidence does not support the Governor's determination he lacked insight into his sexual sadism disorder and, even if he possesses an insight deficiency, it is not rationally related to his current dangerousness, and (3) the 2021 prison incidents do not demonstrate he is a present risk to public safety. We reject these contentions. When we consider the entire record in this case under the extraordinarily deferential standard of review, we readily conclude the record contains more than "some evidence" to support the Governor's conclusion that Rogowski continues to pose an unreasonable risk to public safety. The evidence, in our view, was robust and compelling.

*A.* *The Governor's Reliance on the Aggravated Circumstances of the Life Crime Was Proper and Has Overwhelming Support in the Record.*

It is beyond debate that the circumstances of Rogowski's forcible rape and premeditated murder of Bergsten were "especially heinous, atrocious or cruel." (See Regs., tit. 15, § 2402, subd. (c)(1).) Rogowski's violence against Bergsten was prolonged, brutal, and extremely disturbing in its details. He bludgeoned Bergsten over the head without warning or provocation, bound and shackled her, cut her clothing off of her body as she bled, and engaged in an hours-long session of rape and cruel physical and emotional abuse. By his own account, he capped this violence off with a refusal to give Bergsten a drink of water or loosen her restraints, treated her like chattel by stuffing her into a surfboard bag while still alive, and then suffocated her and disposed of her body in hopes that his violence would not be discovered.

The Governor recited the horrific facts of Rogowski's crimes in the first paragraph of his letter reversing the Board's parole grant and then stated, Rogowski "inflict[ed] prolonged sexual violence" on Bergsten before killing her, and the crimes were "brutally violent." Thus, the Governor relied in part on the aggravated nature of the crimes to deny parole. And there is obviously ample evidence the crimes were especially aggravated, as even the 2011 Board panel found Rogowski's offenses were "particularly egregious" and the 2016 panel found they were "heinous, horrific, [and] monstrous."[24]

Rogowski, however, challenges the Governor's reliance on the aggravated nature of his crimes, in part on the ground the Governor failed to "isolate which circumstances of the crime[s] qualify under the statutory

---

[24] As we previously noted, neither the 2019 or 2022 Board panels confronted Rogowski about the details of the rape and murder.

unsuitability factors." There is no merit to this argument because "nothing in the requirement that a parole denial be accompanied by a 'statement of . . . reasons' demands that the parole authority comprehensively marshal the evidentiary support for its reasons." (*Shaputis II*, 53 Cal.4th at p. 214, fn. 11.) Even so, it would not be difficult to identify the circumstances of the crimes that qualify them as "especially heinous, atrocious or cruel." (Regs., tit. 15, § 2402, subd. (c)(1).) An offense is especially heinous, atrocious or cruel where, as in this case, it is "carried out in a dispassionate and calculated manner," "[t]he victim was abused, defiled or mutilated during or after the offense," or "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." (*Id.*, subd. (c)(1)(B), (C), and (D).)

Rogowski further argues the nature of his crimes, "even one[s] as brutal" as his, are "of *no probative value* in the face of overwhelming evidence of [his] parole suitability," including his in-custody record of rehabilitation. (Italics added.) We disagree. In *Lawrence*, our high court stated, "the statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone *rarely* will provide a valid basis for denying parole when there is strong evidence of rehabilitation *and no other evidence of current dangerousness*." (*Lawrence*, *supra*, 44 Cal.4th at p. 1211, italics added.) Rarely is not never. In concluding the inmate's commitment offense in *Lawrence* did not reliably predict she currently posed a danger to society, the Court made clear its conclusion "d[id] not alter [its] affirmation that certain conviction offenses may be so 'heinous, atrocious or cruel' that an inmate's due process rights would not be violated if he or she were to be

61

denied parole on the basis that the gravity of the conviction offense establishes current dangerousness." (*Id.* at p. 1228.)

Moreover, this is not a case where there is "no other evidence of current dangerousness." (*Lawrence, supra*, 44 Cal.4th at p. 1211.) "Where the record also contains evidence demonstrating that the inmate lacks insight into his or her commitment offense or previous acts of violence, even after rehabilitative programming tailored to addressing the issues that led to commission of the offense, the aggravated circumstances of the crime reliably may continue to predict current dangerousness even after many years of incarceration." (*Id.* at p. 1228; accord *In re Shaputis* (2008) 44 Cal.4th 1241, 1259–1261 (*Shaputis I*).)

Here, the Governor, while commending Rogowski for the strides he made in custody and acknowledging favorable factors such as his youth when he committed the crimes and the number of years he had been incarcerated, concluded he remained a public safety risk because he lacked sufficient insight into his sexual sadism disorder, and he demonstrated that he lacked self-control and skills to safely navigate conflict in the free community. Moreover, although Rogowski, on the basis of his positive parole factors, disagrees with the Governor's conclusion, he does not claim the Governor "neglected to consider any relevant factor." (*Shaputis II, supra*, 53 Cal.4th at p. 212.) As noted, our review is limited to "ascertaining whether there is some evidence in the record that supports the [Governor's] decision." (*Id.* at p. 210.) And as we discuss next, the record here contains not just " 'some evidence,' " but compelling evidence supporting the Governor's conclusions about Rogowski's gaps in insight and self-control, which we conclude constitutes "evidence of current dangerousness." (*Lawrence, supra*, 44 Cal.4th at p. 1211.) Thus even "decades after commission of the offense," or

62

"despite an inmate's discipline-free record during incarceration," the "Governor does not act arbitrarily or capriciously in reversing a grant of parole when evidence in the record supports the conclusion that the circumstances of the crime continue to be predictive of current dangerousness." (*Id.* at p. 1228.)

B.  *The Governor's Insight Finding Is Supported by Sufficient Evidence and Is Not Irrelevant to Rogowski's Current Risk to Public Safety.*

We first consider whether there is at least some evidence in the record to support the Governor's related determination that Rogowski's level of insight, specifically his insight into the nexus between his sex disorder and violent crimes, was deficient so as to support the conclusion he remains a current public safety risk. We conclude there is. The sadistic features of Rogowski's commitment offenses make his history of diagnosis with sexual sadism, and his reactions to those diagnoses, particularly relevant to his risk of reoffending.

Every state psychologist to evaluate Rogowski—four doctors over the span of 13 years—has determined he meets the diagnostic criteria for some form of sexual sadism. In each instance, the diagnosis was based on the sexual violence he inflicted on Bergsten as well as sexually sadistic fantasies he entertained before or after the crimes. Dr. White, the 2019 psychologist, called the disorder "highly relevant" to Rogowski's behavior during the crimes. Significantly, Rogowski's three most recent diagnoses have included the qualifier that he is "in remission in a controlled environment" rather than "[i]n full remission" to reflect that Rogowski's "desired target population is inaccessible while he is in prison." (Italics omitted.) Even more significantly, Dr. Tobin, the 2022 psychologist, warned that "[w]ith access to potential intimate partners in the community, . . . Rogowski's sexually deviant

63

preoccupations could re-emerge," a possibility that was only "moderately mitigated by [Rogowski's] self-awareness, several accountability partners in the community, and advancing age." On this evidence alone, the Governor could properly conclude that Rogowski's sexual disorder was relevant to his commission of the crimes and that it remained probative of his potential to reoffend at the time of his 2022 parole hearing.

Rogowski, however, argues the record is devoid of evidence that he lacks insight into the connection between his sexual sadism disorder and his violent crimes. Focusing only on the specific evidence cited in the Governor's decision, he complains the Governor has "cherry-pick[ed]" a "single quote" from his 2022 CRA interview to support a reversal and has otherwise ignored evidence he understands why he committed the crimes. We disagree.

The Governor expressly relied on Rogowski's 2022 CRA, and more specifically on Dr. Tobin's interview of Rogowski on his thought processes during the crimes. Just before the excerpt of the interview quoted by the Governor, Rogowski revealed he had fantasized about "harming [Bergsten] sexually" and believed "it was ok to try this BDSM experiment on [Bergsten]." Dr. Tobin then asked Rogowski questions aimed at eliciting why the so-called experiment devolved into a sexually violent murder. Specifically, Dr. Tobin asked why he assaulted Bergsten rather than ask her if she was interested in sadistic sexual activity. Rogowski responded that "[i]t was more about violence than about sex" and "[r]ailing" on Bergsten verbally was what was "most pronounced in [his] memory of that night, in addition to the rape." Dr. Tobin then observed that Rogowski "depicted killing her as sort of incidental to quieting her" and asked, "how else did you think it would end?" (Italics omitted.) Rogowski responded, "I don't know. I don't know. [I] just didn't care, just didn't give a damn about the

64

consequences. This was my depravity, not caring about a human life. Had I been sober, I would have had that self-check mechanism; 'wait a minute, call 911, cut your losses.' Wish I could say I had a plan, a specific plan[,] but I didn't."

Rogowski's responses demonstrate he could not identify the thought processes that led him to play out his sexually sadistic fantasies with such brutality that he killed Bergsten to prevent the brutality from being exposed. His responses are still more evidence of a gap in insight. And the insight gap is material to Rogowski's current dangerousness because it suggests he will have difficulty identifying and refraining from acting on similar thoughts in the future should his sexually sadistic ruminations reemerge. (See *Shaputis II*, *supra*, 53 Cal.4th at p. 220 [Governor is not "required to ignore the inmate's understanding of the crime and the reasons it occurred"]; *In re Ryner* (2011) 196 Cal.App.4th 533, 547 (*Ryner*) [lack of insight into circumstances that caused criminal conduct "can imply that the inmate remains vulnerable to those circumstances and, if confronted by them again, would likely react in a similar way"].)

Rogowski's assertions that he "didn't care" and "didn't give a damn about the consequences" of his brutality demonstrate his callousness at the time of the crimes. But his statement that he believed he killed Bergsten because he was not sober enough to "cut [*his*] losses" reflected his current perspective about the murder. His current perspective about the murder demonstrates that as of 2022 he continued to view the consequences of his crimes through the lens of self-interest. The statement is evidence supporting the Governor's finding that Rogowski needed to "demonstrate more developed empathy." And it was not arbitrary for the Governor to rely on evidence of Rogowski's lack of empathy in arriving at his parole decision.

65

Empathy imbues the observer with the ability to appreciate the feelings of others. It is, in essence, the reverse of sadism, in which the observer derives pleasure from others' pain. Rogowski's development of empathy was therefore relevant to his ability to avoid future acts of sexual sadism.

Further still, in claiming the record is devoid of evidence of a lack of insight into his sexual sadism, Rogowski focuses too narrowly on the specific passage of the 2022 CRA quoted by the Governor. Judicial review of a parole decision is not restricted to the evidence expressly relied on by the parole authority. (*Shaputis II*, *supra*, 53 Cal.4th at p. 214, fn. 11.) And as we have said, the Governor is not required to "comprehensively marshal" evidentiary support for his reasons. (*Ibid.*) But here, other aspects of the record contain additional evidence Rogowski lacks insight into the nexus between his sexual sadism and violent crimes.

First, there is evidence Rogowski has minimized, and in 2022 continued to minimize, his symptoms of sexual sadism. Dr. Atwood (in the 2009 CRA) and Dr. Hoyt (in the 2015 CRA) both opined that Rogowski met all criteria for a diagnosis of sexual sadism, including the requirement of experiencing symptoms for at least six months. Dr. Hoyt specified this opinion was "based on recurrent and intense sexual arousal from the physical or psychological suffering of another person, both before *and after* the commitment offense." (See fns. 9, 16, *ante*.) According to Dr. Atwood's 2009 CRA, Rogowski's post-offense ruminations were documented in a July 1992 initial psychiatric evaluation, which reportedly stated Rogowski's "sexual fantasies involve both men and women and he describes them as involving blood, gore, and disgusting sex. He sees these as visions with soundtracks that are sent by Satan's Angels with spiritual warfare going on within him."

66

In his self-authored rebuttal to Dr. Hoyt's 2015 sexual sadism diagnosis, Rogowski claimed the July 1992 report was "erroneous" and he had tried to correct it "ever since he discovered the mistaken report." (Underlining omitted.) These claims are belied by the record. According to the 2009 CRA, Dr. Atwood directly questioned Rogowski about the July 1992 report, including its description of Rogowski's sexual fantasies "involving blood" and "gore" that Rogowski believed were sent by "Satan's Angels." Rogowski's response included no semblance of a claim the July 1992 report was mistaken or erroneous. Quite the opposite. Rogowski simply stated, "That was probably my understanding, my insight level at that time." Far from claiming the July 1992 report was mistaken, Rogowski impliedly acknowledged its accuracy. His statement is evidence supporting the conclusion that he did, in fact, experience the sexually sadistic ruminations documented in the July 1992 report, and that it is his 2015 claim to the contrary that was false. In the 2019 and 2022 CRAs, Dr. White and Dr. Tobin nevertheless adjusted Rogowski's diagnosis to sexual sadism over a period of less than six months, apparently because Rogowski continued to deny having experienced symptoms for longer than six months. However, based on the foregoing evidence the Governor could properly question the credibility of Rogowski's denials. (*Shaputis II*, *supra*, 53 Cal.4th at p. 211 [parole authority is not bound to accept evidence that is unreliable].)

There is further evidence in the record Rogowski has minimized other symptoms of his sexual sadism disorder. In professing that he does not meet the requirements for a full sexual sadism diagnosis, which requires the relevant symptoms to persist for at least six months, Rogowski has claimed his symptoms emerged just weeks before he raped and murdered Bergsten. This claim is not accurate, either. In the 2022 CRA, Dr. Tobin "question[ed]

67

the likelihood of such a sudden, rapid onset of sadistic ruminations, given the culmination in a sexual homicide, a most extreme outcome." Dr. Tobin explained, "More typically, sadistic tendencies may emerge to a lesser degree at an earlier stage of sexual development, with a more gradual increase in sexually sadistic behaviors over time." Based on Dr. Tobin's skepticism about the plausibility of Rogowski's self-reported history, and the mismatch between this history and the pattern in which a sexual sadism disorder typically develops, the Governor could properly conclude Rogowski was still minimizing the extent and severity of his symptoms of sexual sadism.

In reaching this conclusion, we acknowledge that after expressing doubts about the veracity of Rogowski's self-reported history, Dr. Tobin stated "*it is possible . . .* Rogowski's brain trauma, and consequent disinhibition, contributed to the more rapid onset of such ruminations and their extreme outcome." (Italics added.) Although Rogowski does not argue in his petition or traverse that his apparently sudden onset of sexual sadism was, in fact, the result of brain trauma, for the sake of completeness we explain why the Governor was not required to accept Dr. Tobin's brain trauma theory. First, Dr. Tobin characterized the theory as an alternative, possible explanation for the apparently sudden onset of Rogowski's sexual sadism disorder. Assuming the theory was supported by some evidence, it would satisfy the governing standard of review only "if the [Governor] had found [Rogowski] suitable for parole." (*Shaputis II*, *supra*, 53 Cal.4th at p. 213.) However, "[i]t fails to comport with the standard of review, . . . given the [Governor's] finding of unsuitability." (*Ibid.*)

Second, Dr. Tobin's theory is not, in fact, supported by some evidence. Earlier in the report, Dr. Tobin made clear a neurocognitive diagnosis was beyond the scope of his forensic examination, and stated that while it was

68

"plausible" a brain injury could contribute to angry or erotic ruminations, this possibility "*remains very speculative.*" (Italics added.) Thus, by Dr. Tobin's own assessment, the theory that brain trauma accounted for the apparently sudden onset of Rogowski's sexual sadism was speculative. And "speculation is not evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 735.)

Third, the Governor could properly reject Dr. Tobin's theory because it depended entirely on Rogowski's claims that he suffered head injuries that caused brain trauma, and the record contains sufficient evidence supporting the Governor in declining to credit the claims. Rogowski's history of head injuries is entirely self-reported. And yet every state psychologist to evaluate Rogowski has expressly or impliedly questioned his credibility, including on matters of personal history. Specifically, Dr. Atwood "did not find [Rogowski] to be a reliable or credible historian" and opined that he was "manipulative" and "interpersonally exploitative"; Dr. Hoyt found Rogowski to be a questionably reliable historian in the domain of his history of sexual abuse, and identified "deceitfulness" and "repeated lying" as among his narcissistic traits; Dr. White noted Rogowski's history of "repeated lying" and observed that during the interview he "displayed some behavioral manifestations of crying" but had no visible tears; and Dr. Tobin questioned the likelihood of an onset of sadistic ruminations as "sudden" and "rapid" as Rogowski claimed.

Moreover, there is no objective evidence in the record that Rogowski suffered brain trauma as a result of any of the reported injuries. The theory that Rogowski suffered such brain trauma appears to have been introduced by Dr. Stark, a private psychologist retained by the defense to prepare an evaluation for his 2010 parole hearing. Dr. Stark reportedly conducted neuropsychological tests that "d[id] not indicate the existence of current brain damage" and showed Rogowski was "within the normal range of functioning."

69

From this, Dr. Stark concluded Rogowski had suffered head trauma that "resolved with time." In the 2019 CRA, Dr. White noted the absence of contemporaneous neuropsychological testing and opined that "the etiology of his behavioral changes [as reported by Rogowski] remains largely unknown." In essence, Dr. White viewed the available evidence as insufficient to support the theory Rogowski's violence was the result of brain trauma. On this record, the Governor could properly accept Dr. White's opinion, which was nonspeculative, and reject Dr. Tobin's.

In short, the record contains more than just some evidence that Rogowski has minimized the extent and severity of his sexual sadism disorder. This is additional evidence of a deficiency in his level of insight, because one cannot be said to understand a condition whose seriousness one does not fully acknowledge. Thus, the insight gap is material to Rogowski's current dangerousness because his sexually sadistic ruminations were a significant cause of the prolonged sexual violence he inflicted on Bergsten. And his denial about the extent of their historical grip on him makes him vulnerable to succumbing to them again in the future. (See *Shaputis I*, *supra*, 44 Cal.4th at p. 1260, fn. 18 [petitioner's statements minimizing his responsibility for years of domestic violence demonstrated lack of insight]; *In re Rozzo* (2009) 172 Cal.App.4th 40, 61–62 [evidence petitioner denied racial motivations for murder was evidence of his lack of insight].)

Rogowski disagrees. He contends his sexual sadism disorder is not relevant to his potential to reoffend, in essence because the disorder, as he asserts, has played out only in intimate settings and he is not interested in romance. In his traverse, he claims that "[i]n 30 years of prison, [he] has not had a significant romantic relationship." Again, the record belies this claim. The 2022 CRA states Rogowski reported having "three romantic

70

relationships," including a brief marriage, subsequent to his incarceration. By his own account, at the time of his 2016 parole hearing, Rogowski had plans to "eventually" move in with the woman he was then dating when released. And to the extent Rogowski says he plans to avoid romantic encounters during the first year of his release on parole and to start any future romances "as friends," we simply disagree his assurances are sufficient to moot the Governor's concern about his deficient insight into his sexual sadism. Indeed, Dr. Tobin acknowledged in the 2022 CRA that Rogowski had developed strategies for "managing an intimate relationship" in the community, but she nevertheless opined that his history of sexual violence, including "the relationship factor," "remains moderately relevant to risk." Dr. Tobin's opinion is even more evidence supporting the Governor in continuing to view Rogowski's sexual sadism disorder, and his level of insight into the disorder, as relevant to his risk of reoffending, notwithstanding Rogowski's plans for handling intimate relationships on parole.

That is not all. As the People observe, the record contains still more evidence supporting the Governor's parole denial. Specifically, they note that Rogowski has a history of making conflicting statements about the crimes and thereby minimizing his culpability, a pattern that continued through his 2022 CRA interview and parole hearing and supported a finding of current dangerousness. We agree.

For example, during the interview for the 2022 CRA, Rogowski reportedly depicted his killing of Bergsten as "incidental" to quieting her. (Italics omitted.) This portrayal of the homicide as incidental to quieting Bergsten is a theme that harkens back to his post-conviction retraction of his police confession, which he admitted were lies. It stands in contrast to his murder plea, in which he admitted Bergsten's death was a willful, deliberate,

71

and premeditated first-degree murder. It also conflicts with the evidence Bergsten's murder was portended by his previous threat to kill McClain and bury her in the desert, a threat he said he would have carried out by killing McClain "with [his] hands," and his acknowledgement that he transferred his "murderous rage" against McClain to Bergsten "several days" before he killed Bergsten. Rogowski's depiction of the homicide as incidental to quieting Bergsten thus constitutes some evidence he was continuing to minimize his culpability by denying the deliberate and premeditated nature of the murder. (See *Shaputis I*, *supra*, 44 Cal.4th at p. 1260, fn. 18 [petitioner's statements falsely "characterizing the commitment offense as an accident" supported the Governor's conclusion that he lacked insight].)

There is also evidence Rogowski has not been truthful about his intent to physically or sexually assault Bergsten and has minimized this aspect of the crimes as well. Before the night of Bergsten's murder, Bergsten talked to Rogowski on the phone and was overheard declining a visit to his condo. Rogowski reportedly "hated" Bergsten and told his pastor she was "sick." When he confessed the murder to Costantino, he said he "got the girl ([Bergsten]) to his house." (Underline omitted.) While suffocating Bergsten, he "told her that he hated her and everything she stood for."

Yet in his parole proceedings, Rogowski has resisted acknowledging that his assault of Bergsten was anything but a spur of the moment decision. He has offered different explanations for going down to the garage alone while Bergsten remained upstairs, saying he went there to retrieve his drivers' license (according to his police confession), or to warm up his car (according to his testimony during parole hearings). He has also changed his account of when he formed the intent to harm Bergsten. During the interview for his 2009 CRA, he stated he brought the Club upstairs "for some

reason" but did not decide to hit Bergsten with it until after he arrived upstairs. He presented the same sequence of events to the 2011 Board. When the presiding commissioner confronted him with the illogic of removing a steering wheel lock from a car and bringing it into the house, Rogowski implied that he was planning to use it for a bicycle. During the interview for the 2015 CRA, Rogowski stated he was "very inebriated" when he returned upstairs with the Club and "*[w]ithout thinking*" walked over to Bergsten and struck her on the head three times. (Italics added.)

Over the course of subsequent parole hearings, Rogowski gradually changed his narrative and acknowledged forming the intent to harm Bergsten sooner, to the point that in 2022 in response to the prosecutor's questions, he stated that when he made plans to meet with Bergsten, "there was *a shadow of an intent* there *of entertaining the idea of harming* her in some way sexually or otherwise." (Italics added.) Despite the belated admission, there is still a significant difference between harboring "a shadow of an intent . . . of entertaining the idea of harming" someone and the evidence Rogowski wanted to get Bergsten to his condo because he planned to harm her, "sexually or otherwise." On this record, the Governor could justifiably conclude that Rogowski was continuing to minimize the full extent of his plans to harm Bergsten, which "reflects a denial of responsibility, and is probative of current dangerousness." (*In re Tapia* (2012) 207 Cal.App.4th 1104, 1112 (*Tapia*).)

Additionally, during the 2022 parole hearing, Rogowski testified his rape of Bergsten lasted only "three minutes or 10 minutes," despite previously telling the police, the 2011 parole commissioners, and the 2022 state forensic psychologist that the rape lasted two or three hours. There is also evidence Rogowski has exaggerated his substance use to downplay his

73

culpability for the crimes. In his original police confession, he claimed he consumed four glasses of wine and no drugs the night of the crimes. Since then, Rogowski has increasingly added to his original estimates of substance use while simultaneously blaming the substances for his commission of the crimes. This pattern continued in 2022. Specifically, in his interview for the 2022 CRA, Rogowski said that on the night of the crimes, he took a couple of tequila shots, then shared a case of wine with Bergsten, and then consumed codeine followed by an unquantified amount of beer. Rogowski claimed, "I don't think I would have done that [i.e., assaulted Bergsten] had I not been drinking, particularly the synergy between alcohol and codeine."

In the case of each of these glaring inconsistencies, the Governor could reasonably infer the statements that were less favorable to Rogowski's interests were closer to the truth. (See Evid. Code, § 1230 [a statement against a declarant's interest is considered reliable when "so far contrary" to the declarant's interests "that a reasonable man in his position would not have made the statement unless he believed it to be true"].) The Governor could further infer the more favorable statements were offered by Rogowski in order to minimize his culpability, which "is probative of current dangerousness." (*Tapia*, *supra*, 207 Cal.App.4th at p. 1112; see *Mims, supra,* 203 Cal.App.4th at p. 488 [conflicting statements about life crime can reasonably be viewed as an "evolving effort to mitigate [a petitioner's] own culpability [by] reinventing the circumstances of the crime over time"].) In short, all of the above evidence, taken together, is far more than the "modicum of evidence" needed to support the Governor's conclusion that Rogowski lacks insight into his crimes and remains a current danger.

Rogowski objects that the Governor's conclusion about his lack of insight conflicts with the 2022 CRA, in which Dr. Tobin stated Rogowski

"evidenced self-awareness throughout the interview" including when reflecting on the factors that contributed to his life crime. However, in making a parole decision, the Governor has discretion to reject the conclusion of a state forensic psychologist where, as here, some evidence supports the rejection. (*Shaputis II*, *supra*, 53 Cal.4th at p. 213; see *In re Taplett* (2010) 188 Cal.App.4th 440, 449–450 [upholding parole authority's conclusion about the petitioner's lack of insight notwithstanding contrary conclusions in the clinical evaluations].)

In the 2019 CRA, Dr. White found that Rogowski's level of insight was a "predictive factor for recidivism" that "remains relevant." Commenting on her impressions of Rogowski based on her clinical interview, Dr. White opined that "his insight into his ongoing personality pathology and how these factors may impact his future decision-making and behavior remains limited." Although Dr. Tobin's opinion about Rogowski's level of self-awareness differed from Dr. White's opinion that he possessed limited insight, in expressing her more favorable opinion Dr. Tobin did not take into account Rogowski's history of inconsistent statements or address earlier findings that he possessed character traits of deceitfulness and manipulation. For the reasons we have discussed, the record contains evidence Rogowski continued in 2022 to minimize both his culpability for the crimes as well as the true extent of his history of sexual sadism. Based on this evidence, the Governor had valid, non-arbitrary reasons for rejecting Dr. Tobin's opinion. (See *Shaputis II*, *supra*, 53 Cal.4th at p. 211 ["the Governor may not arbitrarily dismiss more recent evidence in favor of older records when assessing the inmate's current dangerousness"].) And while the 2022 Board was satisfied with Rogowski's level of self-awareness, the Governor has discretion to be more stringent and cautious than the Board in determining

whether Rogowski poses an unreasonable risk to public safety.  (See *Lawrence, supra*, 44 Cal.4th at p. 1204.)

Rogowski also argues that his insight cannot be deemed deficient because during his 2022 parole hearing he recited a lengthy list of character traits that led him to commit his crimes.  He contends this shows he "appreciates the breadth of what was wrong with him."  He cites *Ryner* for the proposition that "although a 'lack of insight' may describe some failure to acknowledge and accept an undeniable fact about one's conduct, it can also be shorthand for subjective perceptions based on intuition or undefined criteria that are impossible to refute."  (*Ryner, supra*, 196 Cal.App.4th at p. 548.)  He observes that the *Ryner* court questioned "whether *anyone* can ever fully comprehend the myriad circumstances, feelings, and current and historical forces that motivate conduct, let alone past misconduct."  (*Ibid.*, italics added.)  We are not persuaded.

First, despite identifying several factors that precipitated his violence, Rogowski ultimately struggled to account for the degree of his sexual and physical brutality against Bergsten, comparing his actions to those of school shooters and Boko Haram and telling the Board "[i]t makes no sense whatsoever."  This testimony is additional evidence Rogowski could not explain and therefore did not have a sufficient understanding of the reasons for his extreme violence.  Nor is it unfair to withhold parole when an inmate cannot account for behavior that is so extremely violent even mental health professionals struggle to explain it.  The paramount concern in any parole decision is public safety.  Although prisoners serving life sentences have a due process interest in parole, that interest is served so long as the parole decision is adequately supported.  (*Rosenkrantz, supra,* 29 Cal.4th at p. 664.)  When an inmate has committed extremely violent crimes for reasons that he

cannot explain, under *Shaputis I* and *Shaputis II*, it is reasonable to conclude that the inmate poses a public safety risk and to deny parole on that basis. Denying parole to such an inmate is appropriate even if requiring him to demonstrate insight into the crimes appears unrealistic. Indeed, in *Shaputis I* the evidence of the inmate's lack of insight included psychological evaluations noting his "reduced ability to achieve self-awareness." (*Shaputis I, supra*, 44 Cal.4th at p. 1260, fn. 18.) Our high court nevertheless found these evaluations were among the evidence that supported the Governor's unsuitability decision.

Second, to the extent Rogowski is relying on *Ryner* to question the value of insight as a parole factor generally, his reliance is misplaced. *Shaputis II*, which our high court decided after *Ryner*, rejected the notion that insight is too subjective a concept to have a place in the parole decision. (*Shaputis II, supra*, 53 Cal.4th at p. 218.) And *Shaputis II* has the final say on this question. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) There the California Supreme Court held "the presence or absence of insight is *a significant factor* in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*Shaputis II*, at p. 218, italics added.) Responding to the comment of a past panel of this court that "insight is a particularly subjective factor, amounting to a conclusion drawn from other evidence," the Court noted that "a finding on insight is no more subjective or conclusory than a finding on the inmate's 'past and present mental state' " and that "it has long been recognized that a parole suitability decision is an 'attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts.' " (*Id.* at p. 219.)

77

Third, to the extent Rogowski is relying on *Ryner* to question the validity of the Governor's insight finding specifically, we disagree that *Ryner* helps him. While the concerns expressed in *Ryner* may have had merit in the context of that case, they do not have merit in this case. "[E]ach case must be decided on its own facts" (*In re Casey* (2023) 95 Cal.App.5th 1265, 1271), and "the statutory suitability determination is individualized, and focuses upon the public safety risk posed by the particular offender" (*Lawrence, supra,* 44 Cal.4th at p. 1217). The murder committed in *Ryner* was the result of an impulsive act. The petitioner was drunk and angry about being pushed out of a bar without his beer, and he "grossly overreacted" and fired shots "randomly" into a crowded bar, hitting three people and killing one of them. (*Ryner, supra,* 196 Cal.App.4th at p. 539.) Rogowski's murder of Bergsten was the culmination of a prolonged, sadistic attack during which he raped and essentially tortured her as she begged for her life. His life crime is evidence of a more disordered criminal mindset than was suggested by the random shooting in *Ryner*.

And while in *Ryner* there was "undisputed evidence" the petitioner "acknowledged the material aspects of his . . . conduct and offense," such that the Governor's negative insight finding was unsupported speculation (*Ryner, supra,* 196 Cal.App.4th at p. 549), the same cannot be said here. True, Rogowski identified a number of causes of his crimes in his testimony before the Board. However, that testimony coexists with the other evidence we have identified that supports the Governor's conclusion his insight remains materially deficient and he continues to present a public safety risk. This is not a case, in other words, in which the Governor's insight finding is the product of speculation or a mere refusal to accept undisputed evidence. And under the standard of review we apply, when, as in this case, there is at least

78

some evidence in favor of and against the parole decision, we uphold the decision. (*Shaputis II*, *supra*, 53 Cal.4th at p. 213.)

Fourth, and importantly, we think that in a case like this in which the inmate has repeatedly been found deceitful and manipulative and has provided inconsistent statements on matters ranging from his personal history to what happened during and after the crimes, there is room for the parole authority to question the sincerity of the inmate's testimony about his insights. It is worth noting that virtually everything we know about Rogowski is self-reported. He raped and murdered Bergsten in secret. He disposed of her body under cover of darkness and in a manner such that the only remaining objective evidence of the specifics of her mistreatment was her missing teeth. And although Rogowski ultimately confessed his crimes, he also lied about them extensively to the probation officer to reduce his punishment and was found not credible about the crimes by the 2016 Board. He has also been found dishonest on matters of personal history. He has been declared a "*questionably reliable*" historian about his past sexual abuse, and he has been known to "mak[e] up dramatic but untrue stories about being raped or robbed for the attention and sympathy it brought him."

In short, the record reveals Rogowski has a history of lying about a range of topics, including when he believes it will serve his interests. And there is reason to think this tendency was on display during the 2022 parole hearing. Specifically, he minimized the duration of the prolonged sexual violence from hours down to a matter of minutes. And when confronted during the hearing about his September 5, 2021 chrono, Rogowski denied that he "change[d] [his] story" to the correctional officer, even though the change in story was documented in the officer's written report and Rogowski had signed the report to attest that it was factual. Rogowski then launched

79

into a series of excuses for signing the report and finally questioned whether he had signed the report at all. When the presiding commissioner told him the report did, in fact, bear his signature, Rogowski became verbally "combative." He claimed he had submitted a correction to the report, but the presiding commissioner stated there was no such correction in Rogowski's master file. On this record, the Governor could reasonably question Rogowski's credibility during the 2022 parole hearing, not only about the chrono, but about other matters on which he was testifying in favor of his release. And the Governor could also reasonably view Rogowski's combative behavior during the hearing as some evidence supporting the Governor in doubting the sincerity of Rogowski's testimony about his insights, because Rogowski's behavior tended to refute the conclusion he had made positive changes in his " 'maturity, understanding, and mental state.' " (*Shaputis II*, *supra*, 53 Cal.4th at p. 218; see *ibid.* [a petitioner's insight into his crimes is considered relevant because it reflects " 'changes in [his] maturity, understanding, and mental state' "].)

Finally, to the extent Rogowski compares his case to *Van Houten*, in which the Court of Appeal overturned the Governor's parole reversal after concluding no evidence supported the Governor's decision to deny parole (*Van Houten, supra,* 92 Cal.App.5th at p. 7), we find *Van Houten* to be distinguishable. We grant that this case superficially has a degree of similarity to *Van Houten* in that both cases involve a parole candidate who engaged in significant programming and testified to a number of causes for the commitment crimes. But there are important differences. In *Van Houten*, there was "no indication in the record . . . of a latent underlying factor that potentially could result in violent conduct, nor [had] the Governor identified one." (*Van Houten*, at p. 34.) In this case, by contrast, there is

80

some evidence of a latent underlying causal factor—a sexual disorder more severe than Rogowski currently acknowledges. In *Van Houten*, the record did not support the conclusion the petitioner's statements suggested a lack of insight or candor. (*Id.* at p. 36.) Here, by contrast, it has been known for years that Rogowski has the propensity to be untruthful or deceitful, and there is some evidence that characteristic was on display during the 2022 CRA interview and parole hearing. Finally, in *Van Houten*, the court found the record could not fairly be read to contain evidence the petitioner minimized her culpability for the commitment offenses. (*Id.* at pp. 38–39.) In this case, however, there is ample evidence Rogowski continues to minimize his culpability, including by portraying the murder as incidental to quieting Bergsten, diminishing the duration of the rape from hours to minutes, exaggerating his substance use and its effect on him, and falsely denying that he planned to harm her. The many differences between this case and *Van Houten* explain why we reach a different result here.

In sum, there is *at least* some evidence in the record that Rogowski continues to possess a materially deficient degree of insight into his rape and murder of Bergsten, such that the circumstances of those offenses remain relevant to his current dangerousness. And as we explain next, the 2021 prison altercations documented in Rogowski's recent chronos contribute to the conclusion he remains a public safety risk and provide further support for the Governor's parole denial.

C.      *Rogowski's 2021 Altercations with Other Inmates Are Not Irrelevant to His Current Risk for Violence.*

Rogowski also challenges the Governor's reliance on Rogowski's response to the altercations with other inmates documented in the 2021 chronos as justification for denying him parole. He does not challenge

whether there is some evidence supporting the Governor's conclusion that he was involved in "altercations with other incarcerated people that escalated and became physically threatening." Instead, he contends the incidents do not have "a nexus to present dangerousness." We disagree.

"Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Regs., tit. 15, § 2402, subd. (b).) Thus, "a factor that might not by itself establish an inmate's unsuitability for parole may still contribute to a finding of unsuitability." (*In re Busch* (2016) 246 Cal.App.4th 953, 966 (*Busch*).) That is the case here.

In his parole reversal letter, the Governor concluded that through the 2021 incidents and Rogowski's discussion of them, Rogowski had "demonstrated that [he] lack[s] the self-control and skills to prosocially navigate conflict." The Governor stated, "Although Mr. Rogowski's conduct did not ultimately result in disciplinary action, [his] discussion of the incidents highlighted gaps in insight. In both instances, Mr. Rogowski blames the other party and the staff involved for the altercation. While [he] may not have been the initial aggressor, [he was] not able to account for [his] contributing role, including escalating verbal disagreements and remaining in areas of conflict." The Governor also noted that Rogowski was "not fully honest with correctional staff." In concluding the incidents were relevant to Rogowski's current dangerousness, the Governor cited Dr. Tobin's opinion that the incidents reflected a "lapse in judgement regarding M. Rogowski's decision to remain in circumstances that were evidently threatening for [him]."

In his challenge to the Governor's decision, Rogowski emphasizes that he was the victim of the incidents, not the aggressor, and he did not respond

violently. This misses the point. The Governor acknowledged Rogowski was not "the initial aggressor" but faulted him for his inability to account for his contributing role in the altercations, "including escalating verbal disagreements and remaining in areas of conflict." As the Governor's reliance on Dr. Tobin's opinion shows, it was Rogowski's "lapse in judgment" that was the focus of concern, not his violence.

Further, we disagree with Rogowski's contention that the incidents have no relevance to his risk for violence. The People argue that "Rogowski's behavior during the incidents [was] particularly concerning because [it] mirror[ed] [his] behavior before and during Bergsten's violent rape and murder." We would not go that far. But we note that in both incidents, Rogowski remained in areas of conflict rather than extricate himself, blamed others for the altercations, and provided inconsistent accounts of what occurred. This is some evidence Rogowski continues to lack awareness of dangerous or high-risk situations, placing him at risk for future violence. Rogowski's response to the incidents also reveals a concerning pattern of dishonesty and avoidance of accountability, traits that are relevant to recidivism because they tend to show a belief that one's wrongdoing will not be exposed and punished.

The reemergence of this pattern of behavior is particularly relevant to Rogowski's risk to public safety when considered in combination with the evidence Rogowski continues to minimize his culpability for the crimes and lacks sufficient insight into the connection between his sex disorder and violence. Thus, Rogowski's response to the incidents at least "contribute[s] to a finding of unsuitability," even if it does not establish unsuitability by itself. (*Busch, supra*, 246 Cal.App.4th at p. 966; see Regs., tit. 15, § 2402, subd. (b).)

For these reasons, we disagree with Rogowski's contention that the 2021 incidents have no relevance to his present risk for violence. We therefore reject his challenge to the Governor's reliance on these incidents.

DISPOSITION

Petition denied.

DO, Acting P. J.

I CONCUR:

RUBIN, J.

I CONCUR IN THE RESULT:

BUCHANAN, J.

Filed 6/17/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re MARK A. ROGOWSKI<br><br>on<br><br>Habeas Corpus. | D084748<br><br>(San Diego County<br>Super. Ct. No. HCN1486/<br>CRN20471)<br><br>ORDER CERTIFYING<br>OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed May 22, 2025 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

DO, Acting P. J.

Copies to:  All parties